IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO

DEWEY AMOS JONES,                        )
                                         )
        Plaintiff,                       )  No.
                                         )
        v.                               )
THE CITY OF AKRON, OHIO, ROBERT          )        JURY TRIAL DEMANDED
McFARLAND, CHARLES PARK, CHARLES         )
SNYDER, JR., GEORGE REUSCHER,            )
ROBERT HAMAS, RONALD CLARK, BRUCE        )
VANHORN, and OTHER UNIDENTIFIED          )
MEMBERS OF THE AKRON POLICE              )
DEPARTMENT,                              )
                                         )
        Defendants.                      )
                                         )
                                         )

**COMPLAINT**

Now Comes Plaintiff, Dewey Amos Jones, by and through his
attorneys, and complains of Defendants the City of Akron, Robert
"Russ" McFarland, Charles Parke, Charles Snyder, Jr., George Reuscher,
Robert Hamas, Ronald Clark, Bruce VanHorn, and other unidentified
members of the Akron Police Department.

**Introduction**

1.    Plaintiff, Dewey Amos Jones, was convicted of a murder that
he did not commit. As a result, Mr. Jones spent 19 years incarcerated
as an innocent man.

2.    Tragically, Mr. Jones's conviction was no accident. His
wrongful conviction was the direct result of misconduct perpetrated by
Defendant police officers from the Akron Police Department. This
misconduct included, but was not limited to, witness manipulation,
unduly suggestive identification procedures, and the fabrication,
destruction, and suppression of evidence. In addition, Mr. Jones's

1

wrongful conviction was caused by the unconstitutional policies, practices, and procedures of the Akron Police Department.

3.    Mr. Jones brings this action pursuant to 42 U.S.C. § 1983 and Ohio law.  Mr. Jones seeks redress for the wrongs done to him, as well as to deter future misconduct and to reform the improper policies and practices that emboldened the Defendants to frame him, violate his rights, and cause him to be wrongfully incarcerated for nearly two decades.

## Jurisdiction and Venue

4.    This Court has jurisdiction over Mr. Jones's federal claims pursuant to 28 U.S.C. § 1331, and over his state-law claims pursuant to 28 U.S.C. § 1367.

5.    Venue is proper because, upon information and belief, nearly all of the individual defendants reside within this district, and nearly all of the events giving rise to the claims asserted herein occurred within this district.

## Parties

6.    Plaintiff Dewey Amos Jones is a sixty-two year old resident of Akron, Ohio. Mr. Jones has a large and loving family. When he was wrongfully imprisoned, Mr. Jones had eight children all under the age of 10. These children grew up without a father in their life, as a result of Mr. Jones's wrongful incarceration. Tragically, one of Mr. Jones's children passed away while he was in prison, and others were forced into foster care in the absence of their father.

7.    Defendant City of Akron ("Akron" or "City") is an Ohio municipal corporation that operates the Akron Police Department ("Department").

8.    Defendants Robert "Russ" McFarland, Charles Parke, Charles Snyder, Jr., George Reuscher, Robert Hamas, Ronald Clark, Bruce VanHorn, and other unidentified members of the Akron Police Department (the "Defendant Officers") were at all times relevant to this Complaint law enforcement officers with the Department.

9.    At least one of the Defendant Officers was, at times relevant here, a policymaker, or had been delegated such authority, for the City.

10.   At all times relevant, the Defendant Officers acted under color of law and within the scope of their employment for the City of Akron and the Department.  They are sued in their individual capacities.

**Background**

11.   On November 22, 1994, Dewey Jones was indicted for the murder of Neal Rankin.  On February 28, 1995, Mr. Jones was falsely convicted of this crime, which had occurred two years before. Throughout, Mr. Jones truthfully maintained that he had absolutely nothing to do with Mr. Rankin's murder.

12.   Eventually, DNA testing definitively excluded Mr. Jones as the source of DNA found on crucial crime scene items that the perpetrator touched, and ballistics testing likewise proved that the testimony of the State's primary witness against Mr. Jones was patently false.

3

13.    In light of this, and other, new evidence exonerating Mr. Jones, the Common Pleas Court of Summit County, Ohio granted Mr. Jones's Motion for New Trial in July 2012. On January 30, 2014, after Mr. Jones had served almost twenty years in prison, the State filed a motion to dismiss the charges against him, which the Court granted, finally setting Mr. Jones free from his wrongful incarceration.

**The Murder**

14.    On February 14, 1993, Neal Rankin was found dead in his home from two gunshot wounds to the head. Mr. Rankin's house was ransacked and police believed that the killing took place during the course of a robbery.

15.    Two veteran officers of the Akron Police Department, Defendants McFarland and Parke, assumed primary responsibility for investigating the murder.

16.    Defendant McFarland was the "lead" detective on the case. Defendants Snyder, Hamas, VanHorn, and Clark assisted Defendants McFarland and Parke at various stages of the Department's investigation. Defendants McFarland, Hamas, and Clark also testified at Mr. Jones's trial.

17.    The murder investigation was supervised by Defendant Lieutenant Reuscher and other unidentified members of the Akron Police Department. Defendant Reuscher read and approved the hundreds of investigative reports that the Defendant Officers authored.

**Through Undue Suggestion and Pressure,**
**The Defendants Fabricate Identifications of Mr. Jones**

18.    Although investigators were unable to establish an exact time of death, by all accounts the murder occurred sometime between

4

the evening of February 13 and the morning of February 14. During the night of the murder, Mr. Rankin's car was taken and abandoned about three miles away.

19.   Although there were no eyewitnesses to the murder itself, three people may have viewed the perpetrator around the time of the murder: Robert Strittmatter, Charles Hughey, and Michael Fisher.

**Robert Strittmater**

20.   Robert Strittmatter lived across the street from Mr. Rankin. On the evening of February 13, 1993, Strittmatter was watching Mr. Rankin's house from his own home. The two houses were separated by Independence Avenue, a four lane street.

21.   That day, Strittmatter saw a man leaving the breezeway of Rankin's house. Shortly thereafter, the perpetrator drove away in Rankin's car, which had been stolen in the course of the crime.

22.   Strittmatter had never seen this individual before. In contrast, Strittmatter knew Plaintiff, and could easily identify him by sight.

23.   When investigators first spoke to Strittmatter on February 14, the day Mr. Rankin's body was discovered, he reported exactly what he had observed: a strange man he had never seen before leaving the breezeway of Mr. Rankin's home.

24.   That same day, investigators showed Strittmatter a photo array, from which Strittmatter selected Terry Bowers' photograph as the person he had seen leaving the breezeway.

25.   Over the ensuing months, the investigation floundered. Ten months later, the Defendant Officers were no closer to solving the

Rankin murder than when they started. However, the Defendant Officers had developed a theory that Plaintiff had something to do with the murder.

26.   On December 11, 1993, the Defendant Officers showed Strittmatter a second photo array. This time, Strittmatter identified another man, Bill Wilson, as the person he had seen the night of the murder.

27.   Notably, the December 11 photo array included Plaintiff's photograph, but Strittmatter did not pick him out. Rather, Strittmatter confirmed that he had seen Mr. Jones previously, but maintained that he was not the person he had seen the night of the murder.

28.   On February 23, 1994, a year after the murder, Defendants went back to Strittmatter again. Strittmatter repeated what he had told them on December 11 – that Bill Wilson was the person he had seen the night of the murder and he had not seen Plaintiff that night.

29.   By this point, Defendants had settled on Mr. Jones as their main suspect, despite the absence of any legitimate evidence implicating him in the crime.

30.   On May 3, 1994, Defendants McFarland and Parke tried to get Strittmatter to change his previous identifications and instead finger Plaintiff as the perpetrator.

31.   On that date, these Defendants showed Strittmatter a photo array that included Mr. Jones's photograph.

6

32.  Strittmatter denied that Plaintiff was the person he had seen the night of the murder, but reaffirmed that he had seen Mr. Jones many times before.

33.  To try to wring an identification from Strittmatter, Defendants McFarland and Parke then showed him a single, stand-alone photograph of Mr. Jones, and then asked Strittmatter whether Plaintiff looked like the person he saw in Rankin's breezeway. Despite the manipulation, Strittmatter did not say that Mr. Jones was the person he saw in Rankin's breezeway.

34.  In July 1994, Defendants McFarland and Parke inexplicably returned to show Strittmatter yet another photo array. There was no legitimate police purpose in showing Strittmatter additional photo arrays a year and a half after the murder.

35.  After being shown that photo array, Strittmatter finally succumbed to the Defendant Officers' attempts at manipulation and falsely identified Mr. Jones as the person he had seen leaving the breezeway the night of the murder. Neither Strittmatter nor the police provided any explanation for why Strittmatter had previously maintained that he had never seen the person before.

36.  At trial, the State introduced the false and suggestively obtained identification of Strittmatter against Mr. Jones. Strittmatter's identification of Mr. Jones at trial directly led to Mr. Jones's wrongful conviction.

37.  To prevent Mr. Jones from clearing his name, Defendants destroyed the very first photo array Strittmatter viewed on the very

first day of the investigation, from which Strittmatter had identified Terry Bowers.

38.   That very first photo array would have allowed Mr. Jones to demonstrate to the jury that he did not look like the person initially selected by Strittmatter. The suppression, and eventual destruction, of this material evidence prejudiced Mr. Jones's defense at trial.

### Charles Hughey and Michael Fisher

39.   As stated above, Mr. Rankin's car was stolen the night of the murder and abandoned approximately 3 miles away.

40.   On February 14, 1993, investigators canvassed the area where Mr. Rankin's car was recovered and spoke to Charles Hughey.

41.   At that time, Hughey stated that he had seen a man exiting Rankin's car about four days earlier, and that he had not paid much attention to the man.

42.   That same day, the day Mr. Rankin's body was discovered, investigators showed Hughey the same photo array they had shown Strittmatter. Hughey identified Larry Hayes as the person he had seen near Rankin's car a few days before.

43.   Hughey's step-son, Michael Fisher, also reported seeing a person near Mr. Rankin's car. Independently from Hughey, Fisher was also shown a photo array on February 14, 1993. He likewise identified Larry Hayes from that photo array.

44.   As time wore on, these witnesses' accounts did not comport with the Defendants Officers' theory that Mr. Jones was the perpetrator.

8

45.   Accordingly, ten months later, Defendants McFarland and Parke "re-interviewed" Hughey and Fisher.

46.   On December 13, 1993, these Defendants told Hughey and Fisher that "there were many suspects that developed" since they viewed the photo arrays in February. In truth, Defendants were trying to manipulate Hughey and Fisher to get them to abandon their prior identifications of Hayes and instead identify Plaintiff.

47.   Defendants then showed Hughey and Fisher a photo array. Fisher continued to maintain that Hayes was the person he had seen near Rankin's car.

48.   According to Defendants, however, Hughey now told an entirely different story.

49.   Hughey now claimed, after talking to Defendants McFarland and Parke, that he had actually seen a person walking near Mr. Rankin's car at the spot where it was abandoned on both February 13 and February 14, and not four days earlier. Whereas he previously reported that he had not paid attention to the man, Hughey now asserted that he had actually confronted the person.

50.   In December 1993, Defendants McFarland and Park showed Hughey another photo array. Hughey for the first time identified Mr. Jones's photograph from the array and claimed that he was the person he had seen near Rankin's car — despite never having seen Mr. Jones before aside from the pictures shown to him by the Defendant Officers.

51.   None of the Defendant Officers ever disclosed how they were able to manipulate Hughey to both falsely identify Plaintiff ten

9

months after the fact and to change his story to make it appear that he had a better view of the person he saw.

52.    The State introduced Hughey's false identification of Plaintiff at his criminal trial, which directly led to his wrongful conviction.

53.    As described above, Defendants destroyed the very first photo array Hughey viewed on the very first day of the investigation, from which Hughey had identified Larry Hayes.

54.    That very first photo array would have allowed Mr. Jones to demonstrate to the jury that he did not look like the person initially selected by Hughey. The suppression, and eventual destruction, of this material evidence prejudiced Mr. Jones' defense at trial.

**Witness Manipulation – Further Misconduct**

55.    All three potential witnesses (Strittmatter, Hughey, and Fisher) described the man they saw on or around February 13, 1993 as being clean-shaven.

56.    On February 14, 1993, Mr. Jones voluntarily went to the police station to talk to Defendants McFarland and Snyder about Mr. Rankin's death. While at the station, Mr. Jones answered every question posed by these Defendants.

57.    While at the station that day, Defendants McFarland and Snyder photographed Mr. Jones. In that photo, Mr. Jones had a mustache and full beard. Given his appearance at the time of the murder, Mr. Jones could never be confused with the clean-shaven perpetrator.

58.    However, two months later, Mr. Jones shaved his beard and mustache. Subsequently, in April 1993, Defendant McFarland took

10

another polaroid photo of Mr. Jones, this time depicting Mr. Jones without facial hair.

59.   Although the February photograph accurately depicted Mr. Jones's appearance at the time of the murder, the Defendant Officers instead used the second photograph in all subsequent photo arrays or single photo show-ups, and falsely claimed that it was the photograph that had been taken of Mr. Jones in February 1993.

60.   Moreover, the Defendant Officers destroyed, concealed, or otherwise failed to disclose the initial photo that accurately depicted Mr. Jones's appearance on the night of the murder. Similarly, Defendants never disclosed the fact that the photograph of Mr. Jones that was used in photo arrays, and that was eventually selected by Strittmatter and Hughey and used against Plaintiff at trial, was different from the photo of Mr. Jones that had originally been taken soon after the murder.

61.   Indeed, the Defendant Officers used a number of undisclosed techniques to manipulate Strittmatter and Hughey to falsely identify Plaintiff, including but not limited to improperly highlighting Mr. Jones's photo over other photographs, populating photo arrays with suspects rather than fillers, and other means.

62.   The nondisclosure and suppression of this material evidence prejudiced Mr. Jones's defense at trial in violation of his constitutional rights.

### Undisclosed Benefits to Willie Caton

63.   The testimony of a jailhouse snitch, Willie Caton, was a large piece of the State's flawed case against Dewey Jones.  At trial,

11

Caton falsely testified that, while he and Mr. Jones were in jail together, Mr. Jones confessed to Rankin's murder.

64. Caton's testimony was totally false. Mr. Jones had nothing to do with the Rankin murder and never confessed to Caton or anyone else.

65. Moreover, Caton claimed that Mr. Jones related that a gun the police had recovered prior to his trial was not the murder weapon. This fact is demonstrably false. Subsequent (post-conviction) testing conclusively proved that the gun was indeed the gun used in the murder; Mr. Jones never had any connection to that gun, which was recovered from another individual.

66. For a number of reasons, the Defendant Officers knew Caton's testimony regarding the gun was false even at the time. For one, the Defendants were involved in recovering the murder weapon and through their investigation learned the person who possessed that gun at the time of the murder. Nonetheless, they withheld and suppressed exculpatory information relating to the murder weapon (including the identity of the person who possessed the gun at the time of the murder). The suppression, and eventual destruction, of this material evidence prejudiced Mr. Jones's defense at trial, causing his wrongful conviction.

67. Moreover, the Defendant Officers knew that Caton's testimony about the gun, and about Mr. Jones's supposed "confession," was false and bargained for by the promise of reduced charges and help from Akron police officers in his then-pending and future criminal cases.

12

68.   Pleading in the alternative, the Defendant Officers concocted and fed Caton the false account that Caton gave to prosecutors and eventually testified to at Mr. Jones's trial.

69.   Caton was a life-long criminal who enjoyed numerous undisclosed benefits as a result of his cooperation in Plaintiff's prosecution. Because Defendants repeatedly enabled Caton to avoid responsibility for his crimes in exchange for helping them convict Plaintiff, Caton eventually was free to engage in a high speed car chase that ended in a shoot-out with police, leaving Caton dead, but not before he killed two innocent children, ages 3 and 5.

70.   At the time Defendants approached Caton in the Summit County Jail in 1994, Caton regularly provided "snitch" testimony for the Akron Police Department, and for Defendant McFarland in particular.

71.   In Mr. Jones's case, as in many others before it, Akron police officers provided Caton with undisclosed benefits in exchange for his false testimony. In past cases, these benefits included parole advocacy and recommendations for lenient or reduced sentences.

72.   Caton, who had previously been convicted of aggravated burglary, breaking and entering, receiving stolen property, and multiple parole violations, was awaiting sentencing on another burglary charge when he falsely claimed that Mr. Jones had confessed.

73.   Shortly after providing Defendants Parke and McFarland with Mr. Jones's "confession", Caton received a very lenient sentence of only three years probation (3-15 years suspended sentence) for the burglary conviction.

74.  The Defendant Officers deliberately concealed from Mr. Jones's defense counsel both Caton's past relationship with the Department as a jailhouse informant and the particular benefits that Caton was provided in exchange for his testimony against Mr. Jones.

75.  By failing to disclose this critical, material information, the Defendants prevented Mr. Jones from discrediting Caton's testimony at trial, which would have exculpated Mr. Jones.

76.  The Defendants also withheld other material information about Caton's testimony that Mr. Jones's counsel could have used to impeach his testimony:

    a.  The Defendant Officers never disclosed why Defendant Parke approached Caton in the first place in regard to the Rankin homicide.

    b.  The Defendant Officers never disclosed letters that Caton wrote to Defendant McFarland in which Caton negotiated and arranged the deal by which he would offer false testimony in exchange for preferential treatment from Defendant McFarland and/or Parke.

    c.  The Defendant Officers never disclosed that Caton was close friends with Charles Hughey, the witness who unaccountably came to identify Mr. Jones despite initially fingering another man as a person he saw near Rankin's car.

77.  The nondisclosure and suppression of this material evidence prejudiced Mr. Jones' defense at trial in violation of his constitutional rights and caused his wrongful conviction.

## Additional Withheld Exculpatory Evidence

78.    In addition, the Defendant Officers did not disclose the existence of a bloody handprint that was found on Mr. Rankin's door or any forensic testing performed on that handprint. That forensic testing was exculpatory and would have aided Mr. Jones's defense because it would have shed light on the true perpetrator.

79.    Separately, the Defendant Officers audio recorded witness interviews in which witnesses identified people other than Mr. Jones as the perpetrator of the Rankin murder. Evidence pointing to alternative suspects might have exculpated Mr. Jones or provided valuable information with which to impeach prosecution witnesses. Defendants withheld these recordings from Mr. Jones's defense counsel.

80.    Likewise, the Defendant Officers withheld other exculpatory audio recordings, including recordings of Caton and other key witnesses.

81.    Another man, Gary Rusu, was initially indicted in connection with the Rankin murder but later the charges against him were dropped. Nevertheless, the Defendant Officers failed to disclose the information used to indict Rusu, which presumably would have linked Rusu to the murder, thereby undermining the State's contention that Mr. Jones was the perpetrator.

82.    Indeed, Defendants McFarland and Parke obtained a handwritten note that Gary Rusu's ex-wife, Leslie Butler, gave them. According to Defendants, the "note was written by Rusu and is very incriminating." This note was never disclosed to Mr. Jones, and neither were its contents.

15

83.    Unbeknownst to Mr. Jones and his defense counsel, from January 1994 to June 1994, Defendant McFarland wrote numerous letters to Gary Rusu (who was incarcerated at the time) in which McFarland attempted to coax Rusu into providing false statements incriminating Mr. Jones. In these letters, McFarland offered to testify on Rusu's behalf at parole hearings and "to do anything I can to help you."

84.    These letters would have revealed that Defendant McFarland and other Defendant Officers were engaged in misconduct in order to frame Mr. Jones for the Rankin murder. Because Defendants deliberately withheld the existence of these letters from Mr. Jones's defense counsel, Mr. Jones was never able to present this exculpatory evidence to the jury.

### The Defendants Continue to Manufacture False Evidence Against Mr. Jones, Even After His Indictment and Conviction

85.    Unsatisfied with their other misconduct, the Defendants continued to create a false case against Mr. Jones, even after his indictment.

86.    Indeed, the Defendants' misconduct was idiosyncratic. For example, in a similar manner as they had with Caton, the Defendants sought other false "snitch" testimony from other witnesses who were incarcerated with Mr. Jones as he was awaiting trial. The Defendants sought witnesses who would falsely claim that Mr. Jones had "confessed" some involvement in the Rankin homicide, and its aftermath, while in prison.

87.    To wit, the Defendant Officers falsely claimed that Michael Higgins told them that Mr. Jones confessed that Gary Rusu had

16

committed the murder, and that Mr. Jones helped him dispose of the murder weapon in a pond. In fact, Higgins never said any such thing. The Defendant Officers knew Plaintiff had nothing to do with the murder, but fabricated this story in their attempt to frame him.

88.  Defendant Van Horn also spoke with Mr. Rankin's daughter, Ellen Marie Davis, on a number of occasions.

89.  In her initial interviews, Ms. Davis told investigators what she knew about Mr. Jones, and his relationship with her father. After Mr. Jones was indicted, Defendant VanHorn and other Defendants continued to speak with Ms. Davis, encouraging her to provide testimony implicating Mr. Jones in the murders.

90.  At trial, years after the homicide, Ms. Davis for the first time claimed that Rankin felt "threatened" by Mr. Jones. This statement was false, and the result of the efforts of the Defendant Officers to falsely pin the murder on Mr. Jones. The Defendants withheld and suppressed the substance of their efforts to convince Ms. Davis to provide this false testimony, materially limiting Mr. Jones's defense.

91.  Likewise, in March of 1995, Defendant McFarland, Defendant Van Horn, and other Defendant Officers "re-interviewed" Frank Albert Butler, who had previously truthfully told them that he did not know anything about the Rankin homicide. This time, however, Mr. Butler gave them a story they knew to be false: that Mr. Jones confessed to him and another women, Juliet DeRita, and offered Mr. Butler a deal for telling this story. That deal was never revealed to Mr. Jones.

### Mr. Jones's Wrongful Conviction Was Caused by the Department's Widespread Practices, Customs, and Policies

92.    Though unknown to Mr. Jones and his defense counsel at the time of his conviction, the Department and its high-ranking officers were systematically engaged in police misconduct of the type that led to Mr. Jones's wrongful conviction.

93.    These Defendants were policymakers or were delegated such authority for the City of Akron, and Mr. Jones is one of their victims.

94.    In particular, files would often be destroyed or removed from case files, and reports would be written that included lies and misstatements later used to secure convictions. Moreover, despite being warned, the Department, including Defendant Reuscher, chose to approve of rather than discipline its officers for the widespread misconduct in the Department. This misconduct led directly to Mr. Jones's conviction.

95.    In addition, throughout the course of Mr. Jones's criminal prosecution and his trial, due to policies of the City of Akron, neither Mr. Jones nor his defense counsel was provided with material exculpatory and impeaching information.

96.    At the time of Mr. Jones's prosecution, the Akron Police Department systematically withheld production of material information, both through explicit policies and widespread practices, from criminal defendants.

97.    Due to the Akron Police Department's written and unwritten policies exculpatory information was not, and has never been, provided to Mr. Jones or any of his defense counsel. Indeed, due to the

Department's written and unwritten policies and practices, materially exculpatory and impeaching information was not only withheld but actually destroyed both before Mr. Jones was convicted and even after his conviction as he pursued appeals and post-conviction relief.

**Legal Claims**

**Count I:    42 U.S.C. § 1983 — Suppression of Exculpatory Material**

98.   Plaintiff incorporates every paragraph in this Complaint as if fully set forth here.

99.   As described more fully above, the Defendant Officers acting individually and in conspiracy with each other, failed to disclose and otherwise withheld and/or suppressed exculpatory information and material from the prosecution and, thus, from Plaintiff.

100.  As a result of these violations, Plaintiff was deprived of his right to a fair trial under the Due Process Clause of the Fourteenth Amendment to the United States Constitution, and was falsely convicted for a crime of which he was innocent.

101.  Defendants were acting under color of law and within the scope of employment when they took these acts.

102.  The City of Akron is liable because the violation of Plaintiff's rights described in this Count was caused by the policies, practices, customs, and/or the decisions of policymakers for these Defendants.

103.  Plaintiff suffered actual damages, pain and suffering, lost wages, and other damages as a direct and proximate result.

**Count II:  42 U.S.C. § 1983 — Suggestive Identification**

104. Plaintiff incorporates every paragraph in this Complaint as if fully set forth here.

105. As described more fully above, the Defendant Officers, acting individually and in conspiracy with each other, used improper and suggestive procedures to cause Plaintiff to be misidentified as the perpetrator.  This misconduct tainted the pretrial identifications of Mr. Jones, which were offered against him at trial, and the in-court identifications made during his trial.

106. As a result of these violations, Plaintiff was deprived of his right to a fair trial and was falsely convicted for a crime of which he was innocent.

107. These Defendants were acting under color of law and within the scope of their employment when they took these acts.

108. The City of Akron is liable because the violation of Plaintiff's rights described in this Count was caused by the policies, practices, customs, and/or the decisions of policymakers for these Defendants.

109. Plaintiff suffered actual damages, pain and suffering, lost wages, and other damages as a direct and proximate result.

**Count III: 42 U.S.C. § 1983 — Fabricated Evidence**

110. Plaintiff incorporates every paragraph in this Complaint as if fully set forth here.

111. As described more fully above, the Defendant Officers, acting individually and in conspiracy with each other, fabricated evidence, including but not limited to, false police reports, false

20

evidence of a positive identification of Mr. Jones as the perpetrator, fabricated statements attributed to witnesses, and their own fabricated testimony offered at trial.

112. As a result of these violations, Plaintiff was deprived of his right to fair trial and was falsely convicted for a crime of which he was innocent.

113. These Defendants were acting under color of law and within the scope of employment when they took these acts.

114. The City of Akron is liable because the violation of Plaintiff's rights described in this Count was caused by the policies, practices, customs, and/or the decisions of policymakers for these Defendants.

115. Plaintiff suffered actual damages, pain and suffering, lost wages, and other damages as a direct and proximate result.

### Count IV:  42 U.S.C. § 1983 —Malicious Prosecution

116. Plaintiff incorporates every paragraph in this Complaint as if fully set forth here.

117. As described more fully above, the Defendant Officers and other unidentified members of the Akron Police Department, acting individually and in conspiracy with each other, instigated and continued the prosecution of Plaintiff without probable cause and acting out of malice.

118. As a result of the malicious prosecution, Plaintiff was falsely convicted for a crime of which he was innocent.

119. These Defendants were acting under color of law and within the scope of employment when they took these acts.

21

120. The City of Akron is liable because the violation of Plaintiff's rights described in this Count was caused by the policies, practices, customs, and/or the decisions of policymakers for these Defendants.

121. Plaintiff suffered actual damages, pain and suffering, lost wages, and other damages as a direct and proximate result.

**Count V: 42 U.S.C. § 1983: Destruction of Exculpatory Material**

122. Plaintiff incorporates every paragraph in this Complaint as if fully set forth here.

123. As described more fully above, the Defendant Officers acting individually and in conspiracy with each other destroyed exculpatory and materially favorable evidence, including but not limited to police reports, photographic images and arrays, audio recordings, and other crime-scene evidence. This evidence was destroyed in bad faith.

124. As a result of these violations, Plaintiff was deprived of his right to a fair trial under the Due Process Clause of the Fourteenth Amendment to the United States Constitution, and was falsely convicted for a crime of which he was innocent.

125. Defendants were acting under color of law and within the scope of employment when they took these acts.

126. The City of Akron is liable because the violation of Plaintiff's rights described in this Count was caused by the policies, practices, customs, and/or the decisions of policymakers for these Defendants.

127. Plaintiff suffered actual damages, pain and suffering, lost wages, and other damages as a direct and proximate result.

**Count VI: Ohio State Law — Malicious Prosecution**

128. Plaintiff incorporates every paragraph in this Complaint as if fully set forth here.

129. As described more fully above, the Defendant Officers and other unidentified members of the Akron Police Department, acting individually and in conspiracy with each other, instigated and continued the prosecution of Plaintiff without probable cause and acting out of malice.

130. As a result of the malicious prosecution, Plaintiff was falsely convicted for a crime of which he was innocent.

131. These Defendants were acting under color of law and within the scope of employment when they took these acts.

132. Plaintiff suffered actual damages, pain and suffering, lost wages, and other damages as a direct and proximate result.

**Count VII:  Ohio State Law—Infliction of Emotional Distress**

133. Plaintiff incorporates every paragraph in this Complaint as if fully set forth here.

134. As described more fully above, the Defendant Officers and other unidentified members of the Akron Police Department, acting individually and in conspiracy with each other, intentionally and/or recklessly engaged in extreme and outrageous conduct that caused Plaintiff severe emotional distress and also bodily harm from his distress.

135. These Defendants were acting under color of law and within the scope of employment when they took these acts.

136. Plaintiff suffered actual damages, pain and suffering, lost wages, and other damages as a direct and proximate result.

### Count VIII: Ohio State Law —Indemnification

137. Plaintiff incorporates every paragraph in this Complaint as if fully set forth here.

138. Additionally, and in the alternative, pursuant to Ohio Revised Code, § 1729.031, Defendant City of Akron has a statutory duty to indemnify its current and/or former employees for any judgment entered against them personally in this action for their conduct taken while they were employed by the City.

### Count IX: Ohio State Law – Spoliation of Evidence

139. Plaintiff incorporates every paragraph in this Complaint as if fully set forth here.

140. As described more fully above, the Defendant Officers acting individually and in conspiracy with each other, willfully destroyed evidence in a manner that disrupted Plaintiff's criminal proceedings, knowing that there was pending or probable litigation involving Mr. Jones.

141. As a result of the absence of this evidence, Plaintiff was falsely convicted for a crime of which he was innocent.

142. Plaintiff suffered actual damages, pain and suffering, lost wages, and other damages as a direct and proximate result.

WHEREFORE Plaintiff Dewey Amos Jones respectfully requests that this Court enter judgment in his favor and against Defendants the City of Akron, Robert "Russ" McFarland, Charles Parke, Charles Snyder, Jr., George Reuscher, Robert Hamas, Ronald Clark, and other unidentified members of the Akron Police Department, awarding compensatory damages, costs, and attorneys' fees, along with punitive damages against each of the individual Defendants in their individual capacities, as well as any other relief this Court deems appropriate.

### JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff hereby demands a jury trial on all issues so triable.

RESPECTFULLY SUBMITTED,

/s/ Russell Ainsworth
*One of Plaintiff's Attorneys*

Jon Loevy
Russell Ainsworth
David B. Owens
LOEVY & LOEVY
312 North May St., Suite 100
Chicago, IL 60607
(312) 243-5900