IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION


| | | |
|---|---|---|
| DEWEY AMOS JONES, | ) | CASE NO.  5:14 CV 2618 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | JUDGE DONALD C. NUGENT |
| | ) | |
| THE CITY OF AKRON, *et al.*, | ) | MEMORANDUM OPINION |
| | ) | AND ORDER |
| Defendants. | ) | |


        This matter is before the Court on the Motion for Summary Judgment of Defendants.

(ECF #92).  Plaintiff filed a Response in opposition to the Defendants' motion. (ECF #128).

Defendants filed a Reply in support of their motion for summary judgment.  (ECF #134).   Also

pending before the Court is a fully briefed Motion to Strike Declaration of Thomas Adgate.

(ECF #135, 139, 140).   Having considered all of the submissions, and having reviewed the

undisputed facts and applicable law, this Court finds that Mr. Adgate's Declaration should be

stricken, and Defendants' Motion for Summary Judgment should be GRANTED.

## **Facts and Procedural History**[1]

Plaintiff, Dewey Amos Jones filed a Complaint under 42 U.S.C. § 1983 and Ohio law. Plaintiff voluntarily abandoned certain claims set forth in the Complaint. The remaining pending claims under §1983 are: (1) Suppression of Exculpatory Material; (2) Suggestive Identification; (3) Fabricated Evidence; (4) Malicious Prosecution; and, (5) Conspiracy. He also has pending claims for Malicious Prosecution, Infliction of Emotional Distress, and Indemnification under Ohio state law. (ECF #1). Defendants filed an Answer on March 13, 2015. (ECF #13 ), and filed an Amended Answer on May 5, 2017. (ECF #83).

On February 27, 2017, Plaintiff voluntarily dismissed Defendants Robert Hamas, Ronald Clark, and Bruce Van Horn,[2] pursuant to Fed. R. Civ. P. 41(a)(1). Defendants Charles Snyder and George Reuscher were also voluntarily dismissed on November 1st and 2nd of 2017, respectively. (ECF #110, 111). The remaining Defendants are the City of Akron, Robert McFarland, and Charles Parke.

The Court will not include an exhaustive recitation of the facts and evidence presented during Plaintiff's criminal trial, but will address only those facts relied on by the parties or otherwise relevant to the issues presented for analysis in this case. Neil Rankin was murdered in his home between 4:00 and 8:00 p.m. on February 13, 1993. (ECF #105 at 114-115). One wrist had been tied, and he had been shot twice in the head. There was no sign of forced entry. Mr.

---

[1] Except as otherwise cited, the factual summary is based on the parties' statements of fact. Those material facts which are controverted and supported by deposition testimony, affidavit, or other evidence are stated in the light most favorable to Plaintiff, the non-moving party.

[2] A suggestion of death of Bruce VanHorn was filed on June 22, 2015. (ECF #16). E

Rankin's car was missing, along with several other items that were taken from the house. Plaintiff's wife, Lori Jones, and a friend, Gary Rusu, found the body on February 14, when Ms. Jones claims to have gone to his house to check on him after being unable to reach him the day before. (ECF #101 at 32). An investigation ensued.

The day the body was discovered, police interviewed a neighbor, Mr. Strittmater, who lived directly across the street. According to Detective Lacy's Report of Investigation, Mr. Strittmater recalled seeing a white male, mid-30s, with brown or dark neck length hair, and "beer belly" inside the breezeway of the victim's house around 4:00 pm on February 13, 1993.[3] He indicated that he had not seen the man before, and described him as wearing a 3/4 length dark burgundy jacket, with black pants, black leather shoes, and very noticeable glasses. (ECF # 92-2 at 2). A Report of Investigation filed by Sgt. Arnette the next day indicated that Mr. Strittmater estimated the man's height to be 5'9." (ECF #101 at 35).

Mr. Rankin's car was found the day after the murder. Two witnesses, Mr. Fisher, a teenage boy, and his soon to be stepfather, Mr. Hughey, both saw a man next to Mr. Rankin's car where it had been left after the murder. According to Detective Lacy's Report of Investigation, Mr. Fisher saw a man that afternoon/evening around 4:45 -5:30 p.m., and Mr. Hughey saw "the guy with glasses" on Wednesday, several days prior to the murder. (ECF # 92-2 at 3; ECF #119 at 27). The man was described by Mr. Fisher as white, 28-32 years old, approximately 6'1" and 185 lbs. He was said to have brown, neck length hair, and was wearing a dark leather coat, dark pants, and old style glasses.

---

[3]

  At Plaintiff's trial, Mr. Strittmater testified that he saw this person around 6:30-6:45 p.m.. (ECF #105 at 319).

-3-

Later on the night of February 14th, Sgt. Arnette showed Mr. Strittmater a photo array from which he identified Terry Bowers as the person "who looked most like" the man he had seen in the breezeway. (ECF #101 at 549). The same photo array was shown to Mr. Fisher and Mr. Hughey, the two men who had seen an individual by the victim's car. (ECF #101 at 35). Both of these witnesses selected a photo of Larry Hayes as matching the person they had seen. (ECF #101 at 35). In their briefing, the parties do not clearly indicate whether Plaintiff's picture was contained in this original photo array, however a later statement by Mr. Hughey, and Detective McFarland's testimony at the first suppression hearing suggest that it was not.[4] (ECF #92-2, at 58; ECF #104 at 60, lines 23-25). This photo array was lost sometime before Plaintiff was indicted for the murder, robbery, and kidnaping of Mr. Rankin.

In December of 1993, the police re-visited Mr. Strittmater and showed him another photo array containing sixteen Polaroids. According to Detective McFarland's field notes of this interview, Mr. Strittmater identified Mr. Rusu and Mr. Courie as people he'd seen at the victims house before. He also identified pictures of two women who used to come over to the victim's house. He identified Billy Wilson as someone he had seen coming to the victim's house in an old Chevy pick up, and stated that he was a mechanic. Mr. Strittmater said that if Billy Wilson had been dressed up in a black leather jacket and shaved, "it would look like him" (presumably referring to the person in the breezeway on the day of the murder). (ECF #101 at 145). According to the Reports of Investigation, when questioned whether he had previously identified

---

[4]

 Detective McFarland's Report on December 27, 1993, indicates that when Mr. Hughey was presented with this set of photographs, he identified Plaintiff's photo. Mr. Hughey reportedly stated that he would have picked Mr. Jones initially if his photo had been in the original array. (ECF #92-2, at 58).

a different person, Mr. Strittmater indicated he had previously picked Larry Hayes because his was "the only one of the pictures I saw that I recognized as being over at Neal's. Now that I see both together, I feel that it was this guy (Wilson) that I saw leave the breezeway that night with something under his jacket." (ECF #101 at 145). Detective McFarland's notes from that day, as well as the prior Report of Investigation, shows that Mr. Strittmater never identified Larry Hayes as the possible suspect, but rather had previously identified Terry Bowers. (ECF #102 at 304-306).

According to the Reports of Investigation, Mr. Strittmater identified Plaintiff's photo and one other as people who had been to the victim's house and helped move his car. He also noted that had seen Plaintiff there frequently to clean up the victim's garage. Although it was not mentioned in the Report of Investigation, Detective McFarland's field notes indicated that the Detective then pulled five of the pictures out and told him "if you were shown these five pictures (not knowing the five in the array other than Larry Hayes), what would you say?" From the five photos, Mr. Strittmater "immediately selected Billy Wilson." He said it could also have been a Harold but only if he had shorter hair and was clean shaven at the time. It is unknown whether Plaintiff's picture was one of the five photos pulled out. The police then expanded the array to thirty photos, but the notes do not indicate whether Mr. Strittmater identified any of the individuals in the added photos. (ECF #92-2 at 60-66).

The same thirty photographs provided to Mr. Strittmater were shown to Mr. Hughey and Mr. Fisher, the witnesses who saw a man near Mr. Rankin's car. (ECF #92-57-58). Having seen these new photographs, Mr. Fisher affirmed his original identification of Larry Hayes, while Mr. Hughey selected Plaintiff's picture and reportedly stated that he would have picked that photo

earlier if it had been in the original array. (ECF #92-2, at 58).

On March 8, 1994, Detective McFarland took Mr. Strittmater to a tow yard to identify the orange truck he had seen around Mr. Rankin's house, prior to and on the night of the murder. (ECF #101 at 171). Mr. Strittmater identified the truck as the one he had seen, and stated that he had seen George Courie drive the truck to Mr. Rankin's house a number of times in January and February of 1993. (ECF #101 at 172). According to the Report of Investigation, Mr. Strittmater again stated that Plaintiff was the person he has most often seen at Mr. Rankin's house, but that Billy Wilson was the person he saw in the breezeway the night of the murder. (ECF #101, at 172-173).

On May 3, 1994, Detectives Parke and McFarland visited Mr. Strittmater yet again, and showed him another six picture array. (ECF #100 at 198, 201-202). According to Detective McFarland the purpose of showing the array at this visit was to confirm that Plaintiff was the person who was at Mr. Rankin's house the most often, even though he had already identified him as the most frequent visitor during the prior interviews in December of 1993 and February of 1994. (ECF #100 at 202-203). Mr. Strittmater again identified Plaintiff as "probably the most frequent visitor to Rankin's house," and the signed the back of the picture. (ECF #100 at 205-206).

Mr. Strittmater was then shown a single photo of Plaintiff with glasses on.[5] This photograph was actually a Christmas photo showing Plaintiff with his wife and children. (ECF

---

[5]

Mr. Strittmater had previously stated that the man in the breezeway on the night of the murder had on dark rimmed glasses. The detectives' report indicated that Bill Wilson, the person identified by Mr. Strittmater was not known to wear glasses, but that Plaintiff wore them for reading and driving.

#104 at 75; ECF #100 at 206). According to the Report of Investigation, Mr. Strittmater said "Wow, that really looks like the guy I saw coming out the front door of Neal's house when he walked over towards the truck."[6] (ECF #101 at 217). According to the reports and Detective McFarland's Deposition testimony in this case, this was the first time that Mr. Strittmater made any connection between Plaintiff and the man in the breezeway on the night of the murder. (ECF # 100 at 199- 209).[7] Previously, Mr. Strittmater had repeatedly stated that he had seen Plaintiff at Mr. Rankin's house on frequent occasions but that the person in the breezeway was someone he had never seen before and was a stranger to him. (ECF #100 at 170, 186, 205). The Christmas picture of Plaintiff and his family was the only picture ever shown to the witness in which any subject was wearing glasses. (ECF #104 at 77; ECF #100 at 206). On May 3, 1994, the Detectives also revisited Mr. Hughey. Mr. Hughey reiterated his belief that Plaintiff was the person seen in and around Mr. Rankin's car the day after the murder. (ECF #101 at 217).

Lori Jones, and Virginia Jones, Plaintiff's wife and sister, respectively, were indicted for the Aggravated Murder, Aggravated Robbery, and Kidnaping of Mr. Rankin on June 3, 1994. (ECF #93-4; 93-5). Gary Rusu was indicted on the same charges on July 18. (ECF #93-6). Plaintiff was charged with tampering with evidence and obstructing an investigation. He was arrested on those charges on August 2, 1994. (ECF #92-7).

---

[6] "The truck" was an orange and white truck Mr. Strittmater had seen in the driveway of the apartments next to Mr. Rankin's house the night of the murder. (ECF #101 at 216).

[7] At the October 1994 suppression hearing, Detective McFarland testified that he did not show Mr. Strittmater this picture until after he had already selected Plaintiff from the other array and signed that photo. (ECF #104 at 75-76).

Sometime in October, William Caton, an individual who was incarcerated with the Plaintiff, talked to Detective Parke. Mr. Caton informed Detective Parke that Plaintiff had said that a gun recovered by the police "wasn't the gun" and "that they would never find the gun." (ECF #105 at 258). This was corroborated to some degree by information received from another inmate, Michael Higgins, who reported that Plaintiff told him that he and Gary Rusu had thrown the murder weapon into Blue Pond and the police will never find it there. (ECF #95 at 127).[8] Mr. Caton refused to say anything more about Plaintiff or the murder of Mr. Rankin during that meeting. (ECF #38-2 at 5; ECF #95 at 123).

On October 21, 1994, a suppression hearing was held challenging the identifications of Plaintiff by Mr. Strittmater and Mr. Hughey. (ECF #104). Exhibit 1 at the hearing was the six person photographic array shown to Mr. Strittmater and Mr. Hughey in May of 1994.[9] (ECF #104 at 13-14). The parties have not provided a copy of Exhibit 1a, however, the testimony at the suppression hearing indicates that Exhibit 1a was a picture of Plaintiff. (ECF #104 at 37-38, 66-67). Mr. Strittmater testified that this photograph (1a) was the person he saw at Mr. Rankin's house. (ECF #104 at 14-15). He also testified that this was the same person he identified in December. (ECF #104 at 15). Exhibit 3 was the thirty person array shown to the witnesses in December. Exhibit 3a was picture of Plaintiff, with a mustache but no beard, that

_____

[8] This information turned out to be false. The murder weapon was recovered prior to Plaintiff's trial, but no testing was able to be done identifying it as the murder weapon until after he had been convicted.

[9] Although the Photo exhibits from the suppression hearing are not attached to the transcript, a witness testified that the photo pulled from that array was signed and dated on May 3, 1993. The Reports of Investigation indicate that Mr. Strittmater was shown six photos on that date.

was contained in the thirty person array.[10]  (ECF #104 at63- 46; ECF #93-1 at 8-9).  Billy

Wilson's picture was also in the thirty person array.  (ECF #104 at 65).  Immediately following,

Mr. Strittmater testified that the person he saw at the house on February 13th was the Plaintiff,

and he identified him in the courtroom.   (ECF #104 at 15).

     According to the Report of Investigations, as outlined above, Mr. Strittmater identified

Mr. Wilson, not Plaintiff, as the person he saw (or who looked like he saw) in the breezeway on

multiple occasions, including at the December and May photo arrays.  However, at the

suppression hearing, when questioned about his identification of who was at the house on the

night of the murder, Mr. Strittmater testified that he picked Exhibit 1a (Plaintiff's photo) as "the

man [he] saw at Neal Rankin's house."   (ECF #104 at 14, 62).  He also testified that this picture

was the same photo that he picked from "that large group of photographs."  This would appear to

reference the prior thirty photo array.  Plaintiff's lawyer on cross-examination did try to point out

that Mr. Strittmater previously chose Mr. Wilson's photo on several occasions but did not clarify

that, according to the Reports of Investigation, there was no record that Mr. Strittmater identified

the Plaintiff as looking like the person in the breezeway until he was shown the single family

Christmas photo in which Plaintiff was wearing glasses.[11]  (ECF #104 at 25-26).

     At the suppression hearing, Detective McFarland testified that Mr. Strittmater "zeroed in

on" Plaintiff's picture when he was asked who the "person was he saw around Mr. Rankin's

---

[10]

 Although the photo exhibits from the suppression hearing are not attached to the
transcript or otherwise identified in the exhibits provided in this case, ECF #93-1 at 8-9
shows a Polaroid picture of Plaintiff that is marked as State's Exhibit 3a, dated October
21, 1994, the date of the suppression hearing.

[11]This photo was State's Exhibit Number 2.  (ECF #104 at 67).

house on February 13th." (ECF #104 at 63).   He also testified that neither Mr. Strittmater nor Mr. Hughey were shown the family Christmas photo of Plaintiff wearing glasses until after they had already identified and signed the picture of Plaintiff from the six picture array in May of 1994. (ECF #104 at 76).  The prosecutor focused in closing not on the Christmas photo identification, but on the alleged identification of Plaintiff by both witnesses from the May, six picture array. In closing, he stated that Mr. Strittmater "fairly certainly, picked Dewey Jones" from this array." (ECF #104 at 101).

According to the Reports of Investigation, and Detective McFarland's deposition testimony for this case, Mr. Strittmater did not pick Plaintiff out of the thirty person array.  (ECF #101 at 145).  Detective McFarland confirmed, in his deposition, that Mr. Strittmater had never identified Plaintiff as the man in the breezeway and never stated that he looked like that man until he was shown the Christmas photo of Plaintiff.  (ECF #100 at 213-214).  Specifically he testified that as of May 3, 1994, "as far as my investigation of Robert Strittmater was, he identified Bill Wilson associated with the breezeway, never identified Dewey at that point being at the breezeway and only identified Dewey at that point being the one most often there."  (ECF #100 at 199).

Mr. Hughey testified at the hearing, attesting that he immediately identified Plaintiff as the person he saw with the victim's car following the murder when he was shown Plaintiff's picture in December and in May, both prior to viewing the Christmas photo with glasses.  (ECF #104 at 39, 56).  He told the investigators that he would have chosen Plaintiff's picture in February if it had been included in the original array that he had been shown.  (ECF #92-2 at 58).  This is corroborated by the Reports of Investigation.  Mr. Hughey also identified Plaintiff in

court at the suppression hearing and at trial as the man he saw at the car.  According to his testimony in the deposition for this case, he remains steadfast in belief that the Plaintiff was the person he saw with the victim's car on the day after the murder.  (ECF #99). [12]

> At the conclusion of the suppression hearing, the court held as follows:
>
> The Court has had the opportunity to look at the State's Exhibit Number 1 as well as the other multitude of photographs in this case.  I am not convinced that the out-of-court identification in this case was in any way suggested by or unduly influenced by the photo array process that was conducted in this case ... In any event, the Court does not find the process unduly suggestive in any way, particularly in examining State's Exhibit Number 1... I do not find that that procedure in any way contributed to the identification by Mr. Strittmater or Mr. Hughey.  I feel that they had sufficient opportunity to observe the individual the day in question, so the motion to suppress is hereby overruled.

(ECF #104 at 97-98).

> Based on the testimony provided at the suppression hearing, the identifications by Mr. Strittmater and Mr. Hughey, and other background information, the Prosecutor decided that he would seek an indictment against Plaintiff on the charges of Aggravated Murder, Aggravated Robbery, and Kidnaping, and would dismiss the indictments against the other suspects, Gary Rusu, Lori Jones, and Virginia Jones.  (ECF # 34-7; ECF # 96 at 19-22, 77).  The detectives did not request these additional charges and Detective McFarland, in particular, did not support

---

[12] When asked at the suppression hearing whether he knew Billy Wilson, Mr. Hughey testified that he knew him "just by going to the car lot.... "the only time I ever seen him was when he was working on a vehicle at Chet's Vehicle Exchange."  When asked if he would recognize him on the street, he said "maybe."  (ECF #104 at 53).  In his recent deposition, Mr. Hughey testified that he and Billy Wilson ("Specs") were "lifelong friends...forever," that they'd known each other since at least their early twenties, that they worked on cars together, were into drag racing together, and that Bill Wilson worked for him for "quite awhile."  (ECF #99 at 113-115).  He also said Billy Wilson's son and his son were friends.  When his name was brought up in the investigation, Mr. Hughey testified that he told Detective McFarland "Billy Wilson is not a part of this."  (ECF #99 at 115).

pursuing murder charges against Plaintiff at that time.  (ECF #55 at 55-57).  Plaintiff was indicted for Aggravated Murder, Aggravated Robbery and Kidnaping with firearm specifications on November 22, 1994.  (ECF # 93-8).

On December 10, 1994, Mr. Caton sent Detective Parke a letter that talked about Plaintiff having a part in Mr. Rankin's murder.  (ECF #38-2 at 6-10; ECF #105 at 262).  He was interviewed by Detective Parke and told the detective that Plaintiff had confessed to murdering Neal Rankin.  (ECF # 95 at 144-145).  Later that month, Mr. Caton sent a letter to the prosecutor stating that he did not want to testify against Plaintiff if he was going to be in a correction facility because he was afraid of retribution.  The letter asked the prosecutor for help being placed into treatment and help finding a job.  (ECF #38-2 at 10-12; ECF #105 at 263-265).  Mr. Caton testified at Plaintiff's trial that no one, including the prosecutor, promised to help him in any way, although he hoped that they would.  (ECF #38-2 at 14).

Plaintiff's trial began on February 21, 1995.  (ECF #105).  A mistrial was declared the same day because one of the prosecution witnesses, the daughter of the victim, Mr. Rankin, disclosed the Plaintiff's prior criminal history in front of the jury, despite having being counseled by the Prosecutor and by the Court not to do so.  (ECF #105 at 27-29).  A new jury was empaneled the next day and trial proceeded.  (ECF #105).  Among the evidence presented at trial were the identifications by Mr. Strittmater and Mr. Hughey, and the testimony of Mr. Caton. (ECF #105 at 149).  The victim's daughter also testified that her father had asked her for a gun shortly before his death because he was afraid of the Plaintiff.[13]  Another witness testified that

---

[13] The victim's daughter had never disclosed Mr. Rankin's alleged fear of Plaintiff to to the police prior to trial.  State v. Jones, 1996 Ohio App. LEXIS 289 at *8.

Plaintiff had previously said he was upset that Mr. Rankin gave Virginia Jones more money than he gave to Plaintiff's wife, Lori, and that "he wouldn't mind putting a gun to [Mr. Rankin's] head one day and pulling the trigger." *State v. Jones*, 1996 Ohio App. LEXIS 289, *7. An additional witness tied Plaintiff to the truck parked near Mr. Rankin's house on the day of the murder. *Id*. at *21.

Plaintiff was convicted of Aggravated Murder, Aggravated Robbery, and Kidnaping with firearm specifications. He was sentenced on March 1, 1995 to life imprisonment for the Aggravated Murder, and to ten to twenty-five years each on the Aggravated Robbery and Kidnaping charges. All of the charges were sentenced to run consecutively. He was also sentenced to a mandatory three years to be served first and consecutively to the others for the firearm specification. (ECF #105 at 584-586).

On direct appeal, Plaintiff raised several assignments of error relating to evidentiary rulings, prosecutorial statements in closing, and sufficiency of the evidence. *State v. Jones*, 1996 Ohio App. LEXIS 289 at *1-2. He did not appeal the trial court's ruling denying his motion to suppress Mr. Strittmater's and Mr. Hughey's identifications. *Id.* The Ninth District Court of Appeals overturned the kidnaping conviction for insufficiency of the evidence. All other aspects of the jury verdict and sentencing were affirmed. (ECF #96 at 91; *State v. Jones*, 1996 Ohio App. LEXIS 289). The trial court vacated the kidnaping sentence and issues a new journal entry reimposing the remaining sentences. Plaintiff filed a notice of appeal to the Ohio Supreme Court, which was dismissed as not involving any substantial constitutional question. *See Jones v. Mitchell*, Case No. 4:97 CV 989, April 21, 1997, ECF #13 at p. 2.

Plaintiff then filed a *habeas corpus* petition with the Northern District of Ohio,

challenging his convictions on the grounds that he was denied his right to confront a witness and present a defense when his counsel was prevented from asking Detective McFarland if the victim's daughter had ever mentioned her father's fear of Plaintiff prior to trial. *Jones v. Mitchell*, Case No. 4:97 CV 989. The district court held that even if she had not previously mentioned her father's alleged fear of Plaintiff, this would not demonstrate witness bias and would not have affected the fundamental fairness of his trial. The petition was, therefore, denied. *Jones v. Mitchell*, Case No. 4:97 CV 989, Docket No. 13, 16, January 9, 1998. The denial was appealed to the Sixth Circuit Court of Appeals, and was affirmed. *Jones v. Mitchell*, Case No. 98-3130, February 23, 1999.

At the time of Plaintiff's trial the available DNA testing was not able to provide any results. Plaintiff sought permission to have the DNA evidence tested after his conviction when the testing technology improved to the point where a successful test was possible. Some of the DNA results affirmatively excluded the Plaintiff, and some were inconclusive. The Common Pleas Court of Summit County, Ohio granted Mr. Jones' Motion for New Trial in July 2012, based on the new DNA evidence, which it determined could be exculpatory, but did not conclusively show innocence. The government appealed this decision, and the Ninth District Court of Appeals upheld the ruling. *State v. Jones*, 2013 Ohio App. LEXIS 3029 (9th App. Dist., July 10, 2013).

On August 8, 2013, the state filed a notice of intent to retry Plaintiff. (ECF #43-1 at 4). Plaintiff filed several pre-trial motions, including motions attacking the indictment, the admissibility of Mr. Caton's testimony, the admissibility of Mr. Strittmater and Mr. Hughey's identifications, and addressing other potential evidentiary issues. (ECF #93-13). The Court of

Common Pleas denied the motion to dismiss indictment, the motions to suppress the identifications of Plaintiff, and the motion to suppress Mr. Caton's testimony. (ECF #93-13).

On January 30, 2014, the State filed a Motion to Dismiss the charges against Plaintiff. The Court granted that motion, dismissing the case without prejudice. Consequently, Mr. Jones was set free after serving more than nineteen years in prison. Plaintiff's defense counsel filed a Motion for Dismissal with Prejudice which was denied on February 6, 2015. In its decision the court noted that there was no statute of limitations on murder, and declared that it could not make a presumptive finding that any future prosecution would violate Plaintiff's speedy trial rights. (ECF # 43-1).

This case was filed on December 1, 2014, seeking damages for alleged violations of his right to fair trial under 42 U.S.C. § 1983, and for Malicious Prosecution, Infliction of Emotional Distress, Spoilation, and Indemnification under Ohio state law.

## **Summary Judgment Standard**

Summary judgment is appropriate when the court is satisfied "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). The burden of showing the absence of any such "genuine issue" rests with the moving party:

> [A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any,' which it believes demonstrates the absence of a genuine issue of material fact.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (citing FED. R. CIV. P. 56©). A fact is

"material" only if its resolution will affect the outcome of the lawsuit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Determination of whether a factual issue is "genuine" requires consideration of the applicable evidentiary standards. The court will view the summary judgment motion in the light most favorable to the party opposing the motion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Summary judgment should be granted if a party who bears the burden of proof at trial does not establish an essential element of their case. *Tolton v. American Biodyne, Inc.*, 48 F.3d 937, 941 (6th Cir. 1995) (citing *Celotex*, 477 U.S. at 322). Accordingly, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Copeland v. Machulis*, 57 F.3d 476, 479 (6th Cir. 1995) (citing *Anderson*, 477 U.S. at 252). Moreover, if the evidence presented is "merely colorable" and not "significantly probative," the court may decide the legal issue and grant summary judgment. *Anderson*, 477 U.S. at 249-50 (citations omitted). In most civil cases involving summary judgment, the court must decide "whether reasonable jurors could find by a preponderance of the evidence that the [non-moving party] is entitled to a verdict." *Id.* at 252. However, if the non-moving party faces a heightened burden of proof, such as clear and convincing evidence, it must show that it can produce evidence which, if believed, will meet the higher standard. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989).

Once the moving party has satisfied its burden of proof, the burden then shifts to the non-mover. The non-moving party may not simply rely on its pleadings, but must "produce evidence that results in a conflict of material fact to be solved by a jury." *Cox v. Kentucky Dep't of Transp.*, 53 F.3d 146, 149 (6th Cir. 1995). FED. R. CIV. P. 56(e) states:

> When a motion for summary judgment is made and supported as provided in this
> rule, an adverse party may not rest upon the mere allegations or denials of the
> adverse party's pleading, but the adverse party's response, by affidavits or as
> otherwise provided in this rule, must set forth specific facts showing that there is
> a genuine issue for trial.

The Federal Rules identify the penalty for the lack of such a response by the nonmoving party as an automatic grant of summary judgment, where otherwise appropriate. *Id.* Conclusory, factually unsupported allegations are insufficient to withstand a motion for summary judgment. *Gagne v. Northwestern National Ins. Co.*, 881 F.2d 309, 315-16 (6th Cir. 1989).

Though parties must produce evidence in support of and in opposition to a motion for summary judgment, not all types of evidence are permissible. The Sixth Circuit has concurred with the Ninth Circuit that "'it is well settled that only admissible evidence may be considered by the trial court in ruling on a motion for summary judgment.'" *Wiley v. United States*, 20 F.3d 222, 225-26 (6th Cir. 1994) (quoting *Beyene v. Coleman Sec. Servs., Inc.*, 854 F.2d 1179, 1181 (9th Cir. 1988)). FED. R. CIV. P. 56(e) also has certain, more specific requirements:

> [Rule 56(e)] requires that affidavits used for summary judgment purposes be
> made on the basis of personal knowledge, set forth admissible evidence, and show
> that the affiant is competent to testify. Rule 56(e) further requires the party to
> attach sworn or certified copies to all documents referred to in the affidavit.
> Furthermore, hearsay evidence cannot be considered on a motion for summary
> judgment.

*Wiley*, 20 F.3d at 225-26 (citations omitted). However, evidence not meeting this standard may be considered by the district court unless the opposing party affirmatively raises the issue of the defect.

> If a party fails to object before the district court to the affidavits or evidentiary
> materials submitted by the other party in support of its position on summary
> judgment, any objections to the district court's consideration of such materials are
> deemed to have been waived, and [the Sixth Circuit] will review such objections
> only to avoid a gross miscarriage of justice.

-17-

*Id.* at 226 (citations omitted).

As a general matter, the district judge considering a motion for summary judgment is to examine "[o]nly disputes over facts that might affect the outcome of the suit under governing law." *Anderson*, 477 U.S. at 248. The court will not consider non-material facts, nor will it weigh material evidence to determine the truth of the matter. *Id.* at 249. The judge's sole function is to determine whether there is a genuine factual issue for trial; this does not exist unless "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.*

In sum, proper summary judgment analysis entails "the threshold inquiry of determining whether there is the need for a trial--whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson*, 477 U.S. at 250.

## Analysis

I. 42 U.S.C. § 1983/Due Process Clause

 A. Suppression of Exculpatory Material

Plaintiff originally claimed that the prosecution destroyed and/or failed to turn over several items of exculpatory evidence. He has since abandoned his claim for destruction of evidence, so the Court will consider only those items claimed to have been in the Defendants' possession and allegedly withheld from the Plaintiff prior to his criminal trial. (ECF #128 at 24, fn. 10). The information Plaintiff claims was suppressed includes: (1) Detective McFarland's

personal file (consisting primarily of his field notes), [14] as well the field notes of Detective Parke; (2) letters written to suspect Gary Rusu; (3) alleged promises made to William Caton, Michael Higgins, Albert Frank Butler, and Juliet DeRita; (4) photo arrays shown to Mr. Hughey and Mr. Strittmater; (5) a photograph of Plaintiff taken on February 15, 1993; (6) audio recordings of interviews; and, (7) information relating to the murder weapon. Defendants claim that Plaintiff had independent access to the information contained in some of these materials; that some of these materials do not, and have not ever existed; and, that the information contained in these materials was neither material nor exculpatory.

Suppression of material evidence, whether exculpatory or impeaching, deprives the defendant of his right to due process when there is a reasonable probability that, had the favorable evidence been disclosed, the outcome of the trial would have been different. *Brady v. Maryland*, 373 U.S. 83, 87 (1963). To prove a claim under *Brady*, Plaintiff "need not show that he 'more likely than not' would have acquitted had the evidence been admitted. . . . He must only show that the new evidence is sufficient to 'undermine confidence' in the verdict." *Wearry v. Cain*, 136 S.Ct. 1002, 1006 (2016)(citing *Smith v. Cain*, 132 S.Ct. 627, 629-31 (2012)). If the prosecution fails to turn over multiple pieces of favorable evidence, the court must look to the potential cumulative effect the undisclosed evidence could have had on the jury verdict. *Gumm*

---

[14] The only documents contained in the file that Plaintiff has argued contains exculpatory material are Detective McFarland's field notes. Therefore, the Court will refer only to the field notes from this point forward. The file did contain one Report of Investigation that both parties agree should have been disclosed to Plaintiff, but Plaintiff does not argue that the information in the report was exculpatory, or that the information contained therein was not otherwise available to him. There were also some messages Detective McFarland received from Detective Parke, but again there is no indication that the information contained therein was exculpatory or not otherwise available to the Plaintiff.

*v. Mitchell*, 775 F.3d 345, 370 (6th Cir. 2014)(citing *Kyles v. Whitley*, 514 U.S. 419, 434 (1995)). There is no constitutional violation "if the defendant knew or should have known the essential facts permitting him to take advantage of the information in question, or if the information was available to him from another source." *Carter v. Bell*, 218 F.3d 581, 601 (6th Cir. 2000).

One of Plaintiff's trial attorneys, Vincent Alfera, testified at his deposition that the prosecution in Plaintiff's trial had an open file discovery policy which gave defense attorneys full access to the prosecutor's file, allowing them to go through and "read anything that's in there." (ECF #124 at 22). Plaintiff does not dispute that this was the policy of the prosecutor's office, however, he claims that the police had potentially exculpatory information that never made it into the prosecutor's file. Police officers are obligated turn over to the prosecutor information if they are aware the evidence has exculpatory value. *D'Ambrosio v. Marino*, 747 F.3d 378, 389 (6th Cir. 2014).

1. <u>Field Notes</u>

a. <u>Qualified Immunity</u>

At the time of the investigation and trial in this case, existing Ohio case law protected officer field notes from discovery. *State v. Daws*, 104 Ohio App.3d 448, 474 (1994); see also, Crim.R.16(B)(1)(a)(ii). Police officers are entitled to qualified immunity from liability for civil damages unless the Plaintiff can show that: (1) viewing the evidence in the light most favorable to the plaintiff, the official violated a statutory or constitutional right, and (2) the right was clearly established at the time of the challenged conduct. *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011). "An officer 'cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would

have understood that he was violating it.'" *Kisela v. Hughes*, 584 U.S. ___ , ___ (2018)(Case No. 17-467, U.S. Supreme Ct. April 2, 2018)(citing *Plumhoff v. Rickard*, 572 U.S. ___, ___ (2014)(slip op., at 12).

Plaintiff cites two Sixth Circuit cases from 2013 and 2016 for the proposition that suppression of undocumented statements and officers' "field notes" is a violation of *Brady*. Without fully reviewing the parameters of these cases, even if they do stand for the proposition for which they are cited, something that is clearly established in 2013 or 2016 may not have been well established in 1993 and 1994, the relevant time period in this case. Defendants have pointed to law that would have been relevant to Detective McFarland and Detective Parke's decision making at the time, and that law would have reasonably supported the belief that field notes were not discoverable. *State v. Daws*, 104 Ohio App.3d 448, 474 (1994); *State v. Vinson*, 70 Ohio App.3d 391, 400 (1990). Plaintiff has not pointed to legal authority in place during the relevant time period that would show this belief to be unreasonable. Because Plaintiff has failed to establish that the right to obtain officer's field notes was a clearly established right in 1993 and 1994, Detectives McFarland and Parke cannot be held liable for withholding or destroying their field notes.[15]

Even if they were not entitled to qualified immunity on this issue, there is absolutely no evidence suggesting that any information contained in Detective Parke's notes was exculpatory or would not have been otherwise available to the Plaintiff through the Reports of Investigation. Further, the evidence presented by Plaintiff is insufficient to show that any of the notes or other

---

[15] Detective Snyder and Lt. Reuscher have been dismissed from the case, and there is no evidence or suggestion that any other defendant had a role in withholding or destroying the field notes of these two officers.

information contained in Detective McFarland's personal file contained exculpatory material that was otherwise unavailable to the Plaintiff.

### b. Alternative Suspects

Plaintiff argues Detective McFarland's field notes contain information about alternative suspects that would qualify as classic *Brady* material under *D'Ambrosio v. Bagley,* 527 F.3d 489, 499 (6th Cir. 2008). His notes mention a witness who implicated George Courie, Mr. Strittmater's alleged identification of "Harold" during one of the arrays, the fact that Mr. Strittmater "talked about" Larry Hayes, information obtained on Bill Wilson, and communications with another suspect, Gary Rusu. All of these people, except Harold, were known by Plaintiff to be suspects without regard to the information contained in Detective McFarland's notes. [16]

The Reports of Investigation available to Plaintiff's counsel disclosed that Michael Fisher and Mr. Hughey originally identified Larry Hayes as the person they saw near Mr. Rankin's car. (ECF #101 at 35, 148-49). The reports also documented Mr. Strittmater's identification of Bill Wilson. (ECF #101 at 145). There were reports identifying George Courie, Angel, and Bill Wilson as people who knew about or may have been involved in the murder. (ECF #101 at 125-27). Another said that a private investigator told one of the witnesses that Johnny Crites drove Gary Rusu, Lori Jones, Virginia Jones, and Billy Wilson to the victim's house on the night of the murder. (ECF #101 at 315).

The reports indicated that Mr. Strittmater identified the truck at the scene as belonging to

_____

[16]

It also bears noting that the evidence in Mr. Rankin's homicide case pointed to the existence of multiple actors in the crime. Therefore, even if there had been proof of other people's involvement in the crime, this would not necessarily have exonerated the Plaintiff.

George Courie, and that he identified Larry Hayes as someone he recognized as having been at the victim's house. (ECF #101 at 143, 145). Gary Rusu, along with Plaintiff's wife and sister were indicted for the murder and robbery before the Plaintiff was indicted. One Report of Investigation noted that Gary Rusu flunked his polygraph "very badly" and was a "prime suspect." (ECF #101 at 265).

Harold was never identified in any of the Reports of Investigation, however, according to Detective McFarland's notes, Mr. Strittmater said that Harold could be the one "only if he had shorter hair and was clean shaven at the time . . . If Harold looked exactly like this long hair and beard it wasn't him, it was [Billy Wilson]." (ECF #101 at 309). Detective McFarland underlined the comment about shorter hair and did not report the mention of Harold in his Report of Investigation. There is no other evidence to suggest that Harold had anything to do with the murder or that he was a viable subject. There is also no evidence to suggest that he had shorter hair or was clean shaven at the time of the murder. Plaintiff has, therefore, not established that the conditional mention of Harold is exculpatory, or that Detective McFarland would have reasonably believed that it was information subject to the *Brady* disclosure requirements. All other potential suspects had been disclosed to the Plaintiff through the Reports of Investigation. Therefore, there was no information contained in Detective McFarland's personal notes, which identified or implicated other suspects, and was not otherwise available to the Plaintiff,.

c. Rusu Letters

Detective McFarland corresponded with Gary Rusu prior to Plaintiff's trial. He did not keep copies of any of the letters, but made mention of the letters and some of their content in his personal notes. Plaintiff was somehow able to obtain the letters sent to Mr. Rusu during the

course of this civil action, but there is no allegation that Detective McFarland kept copies of any of these letters.[17] The letters from Mr. Rusu to Detective McFarland were destroyed. As Plaintiff has withdrawn his claim for destruction of evidence, this issue would be moot, but for the existence of some notes, retained by Detective McFarland, referencing the content of those letters

Plaintiff offers no explanation as to how the content of these letters would qualify as exculpatory or impeachment evidence. A review of the letters written by Detective McFarland, and the notes relating to these letters give no indication that either he or Mr. Rusu, in his responses, offered any information that would be exculpatory.[18] Detective McFarland testified that he did not receive any information of importance from Mr. Rusu, and that he saw no need to retain copies of the letters. (ECF #100 at 242-43). There is no evidence to suggest that these letters possessed exculpatory value that was apparent to Detective McFarland or was of "such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means. *U.S. v. Wright,* 260 F.3d 568, 570-71 (6th Cir. 2001).

The letters do indicate that Mr. Rusu may have believed that George Courie, Virginia, and Angel were involved in the robbery and murder of Mr. Rankin. Each one of these potential

---

[17] Defendants assert that the letters do not qualify as *Brady* material because Plaintiff could have obtained them during the course of discovery during the criminal trial. There is some evidence to support this position. Reference to Detective McFarland's correspondence with Gary Rusu was made in a Report of Investigation filed by Detective McFarland on June 25, 1994, prior to Plaintiff's arrest in this case. (ECF #101 at 281). This report would have been available to Plaintiff's attorney through the open discovery process. Once aware of such correspondence, Plaintiff's counsel could have requested to view the letters or any notes referencing the content of those communications.

[18] There are also segments of these letters that would actually tend to incriminate rather than exculpate the Plaintiff.

suspects identified in the letters is also identified in the Reports of Investigation available to Plaintiff's defense counsel. The notes also include an admission by Detective McFarland that the lead suspect had changed a multitude of times, and that Mr. Rusu and Lori Jones failed their polygraph tests. The fact that Gary Rusu flunked his polygraph test was also mentioned in the Reports of Investigation. (ECF #101 at 265). Further, Lori Jones was married to Plaintiff and, as such, he would have access to her and any information she knows, including her failure of the polygraph test or threats she may have received.

As Plaintiff has not identified or explained how any specific information in these letters, not available by other means, would have been exculpatory, the letters would not qualify as *Brady* material, even if the Detective had retained copies. Therefore, the failure to keep the letters or turn over notes referencing the letters is without constitutional consequence. Plaintiff has not met his burden of showing that the withholding of the notes referencing the letters violated Plaintiff' due process rights.

### d. Strittmater Identification

The Plaintiff claims that notes by Detective McFarland indicating that Mr. Strittmater never identified Larry Hayes from the first photo array have been withheld, but he offers no explanation of how this information would be exculpatory. Mr. Strittmater identified Terry Bowers from the first array, which was presented on February 14, 1993 by Detective Lacy and Sgt. Arnette. (ECF #101 at 549). At some point Detective Parke erroneously informed Detective McFarland that Mr. Strittmater picked Larry Hayes from that array. (ECF #102 at 317). When Detective McFarland spoke with Mr. Strittmater in December, Mr. Strittmater clarified that he had never chosen Larry Hayes from the original array, but his wife mentioned

that she thought that is who he had picked. (ECF #118 at 63). The Report of Investigation made from this encounter mistakenly said he chose Larry Hayes. (ECF #101 at 145).

Plaintiff had access to the Report of Investigation that mentioned Mr. Strittmater's identification of Terry Bowers, which was written by Sgt. Arnette, as well as the mistaken statement in Detective McFarland's report. Plaintiff has offered no explanation as to how Detective McFarland's notes, which verified Sgt. Arnette's disclosed reports would have provided new exculpatory evidence that would have helped the defense. Further, even if that information were exculpatory, and the misstatement of Mr. Strittmater's identification amounted to more than mere negligence, Detective McFarland would have had no reasonable expectation that he needed to disclose field notes that simply confirmed what was reported previously by another officer, and he would, therefore, be entitled to qualified immunity.

Plaintiff also claims that information was withheld about statements Mr. Strittmater may have made about Larry Hayes. He does not specify what those statements are, though Detective McFarland's notes say that the Strittmaters talked about how he and his wife had seen Mr. Hayes at Mr. Rankin's before. He also confirmed that Mr. Hayes picture had been in the original photo array, and that he did not pick his photo from that array. (ECF #102 at 309). As discussed above, none of this information is exculpatory to the Plaintiff, and the fact that Larry Hayes was at one time a potential suspect was disclosed to Plaintiff through multiple other documents.

With regard to Mr. Strittmater's identification of Billy Wilson, the Reports of Investigation available to Plaintiff prior to his suppression hearing and trial match what Plaintiff asserts are the real facts of this case. The Reports of Investigation state that Mr. Strittmater identified Terry Bowers during the first array, and then identified Billy Wilson in a subsequent

photo viewing. During the December 1993 interview, Mr. Strittmater stated that if Billy Wilson had been dressed up in a black leather jacket and shaved, "it would look like him" (referring to the person in the breezeway on the day of the murder). (ECF #101 at 145). They also indicated that he affirmed his identification of Billy Wilson in a conversation with Detective McFarland when they were viewing the truck that was seen at the scene the night of the murder. (ECF #101, at 172-173). According to the report Mr. Strittmater "said that the stocky man (Bill Wilson) that worked on Neal's cars was the one he saw leave Neal's 'with something under his coat.'" (Id.) There is no allegedly suppressed evidence identified by Plaintiff in Detective McFarland's notes that added any information, exculpatory or otherwise, relating to Mr. Strittmater's identification of Billy Wilson.

Plaintiff claims in his Brief in Opposition that information was withheld about a photo array that was provided to Mr. Strittmater including a photograph of Plaintiff where Mr. Strittmater did not pick Plaintiff from the array. He cites Detective McFarland's notes from the December 23, 1993 interview with Mr. Strittmater. This information, however, was disclosed in the Reports of the Investigation. The array mentioned in the notes is simply a subset of the thirty photographs that were shown to Mr. Strittmater on that date, as reflected in the Report of Investigation. The Report correctly notes that Mr. Strittmater picked Billy Wilson's photo from this grouping and that he identified Plaintiff only as someone they had seen pushing Mr. Rankin's car whenever they would work on it, or sweeping and cleaning the garage. (ECF #101 at 145). Thus, this information was not suppressed or withheld from the Plaintiff during discovery.

The notes reflecting Detective McFarland's comment that "people change since photos

-27-

were taken" would not be exculpatory because that comment would not improperly influence a witness' identification. It did not single out any particular suspects or photographs and cannot be said to be unduly suggestive or otherwise consequential in affecting whose photograph a witness may choose. Such admonitions are in full compliance with past and current recommendation by the International Association of Chiefs of Police, (ECF #92-12, PageID #1018), and have been held to be proper by other courts. See, e.g., U.S. v. Whittle, 2016 WL 4408992, *5 (W.D. Ky 2016). Further, even with this admonition, according to the Reports of Investigation, Mr. Strittmater did not pick Plaintiff as being the person in the breezeway. Therefore, there does not appear to be any exculpatory value to the plaintiff in knowing that this admonition was given.

Finally, Plaintiff argues that, in general, there can be no doubt that shifting identification testimony, especially Mr. Strittmater's refusal to identify the Plaintiff as the man near the breezeway, would be favorable to the defense. That may be true, but this information was not withheld from the defense. Plaintiff and his counsel had access to the Reports of Investigation that mentioned all of the potential suspects, listed multitudes of potential witnesses, outlined numerous leads and theories provided by the community, and made clear that, at least according to the Reports of Investigation, Mr. Strittmater did not identify Plaintiff as resembling the person in the breezeway until May of 1994, when he was shown the Christmas picture. None of this information was withheld, and none of the information claimed to have withheld has been shown to have any exculpatory value. Therefore, Plaintiff has shown no basis for a *Brady* violation based on the identification information contained in Detective McFarland's field notes.

2. <u>Undisclosed Promises to Witnesses</u>

Plaintiff claims that Detectives McFarland and Parke made undisclosed promises to Bill Caton, Michael Higgins, and others in exchange for information and testimony. There is no dispute that Bill Caton was the only one of these individuals who testified at trial. Any alleged promises made to the other individuals would, therefore, have had no impact on the constitutionality of Plaintiff's trial. *U.S. v. Mahdi*, 999 F.Supp. 236, 245 (D.C. 2013). The information obtained from these witnesses was available to the defense through the Reports of Investigation, which were accessible before trial. Any incentives offered in exchange for such information is not relevant to the constitutionality of Plaintiff's trial unless the evidence was used at trial. Bill Caton was the only informant who presented testimony at Plaintiff's trial. There is no evidence that Bill Caton was promised any undisclosed benefits in exchange for his testimony.

Michael Higgins testified in his deposition for this case that the Detectives promised things verbally that were not documented on paper, (ECF #97 at 13-14, 58-60, 62-63). He also testified that there was no agreement or sharing of information between him and Mr. Caton, and that all he knew about Mr. Caton's dealings with the police was that he saw them talking together. (ECF #97 at 13-14). He did not testify at Plaintiff's trial and received no benefits for the information he provided to the Detectives in the Plaintiff's case.

Detective McFarland testified during his deposition in this case that although officers are aware that informants may be looking for some kind of benefit when they provide information, he and others "would make them no promises." (ECF #100 at 62). He further testified that officers "didn't have the ability to promise anything, we weren't allowed to, we didn't." (ECF #100 at 64). The Detective did admit to providing truthful information about Mr. Caton in his

sentencing at a parole hearing when he was asked to attend, but there is no evidence that he promised anything ahead of time in exchange for information in Plaintiff's case. Plaintiff has cited no testimony from Mr. Higgins, Mr. Caton, Detective McFarland, or anyone else stating that unwritten or otherwise undisclosed promises were made to Bill Caton.[19]

There is no dispute that Bill Caton hoped to receive a benefit for provided testimony against Plaintiff at his trial.[20] However, an inmate's hope or expectation of future benefits is not evidence of promise by authorities to provide any such benefit. At Plaintiff's trial Mr. Caton testified that he received probation with a placement at a Community Based Correctional Facility in lieu of a 3-15 year sentence for the crime he was incarcerated for when he met Plaintiff and offered information to the Detectives on Plaintiff's case. (ECF #105 at 236-238, 254-256). He also testified that he sent a letter to the prosecutor giving information against Plaintiff and saying that he didn't want to testify in Plaintiff's case if he was going to be sentenced to the Community Based Correctional Facility in his own case. He also asked the prosecutor to help him find a job, and to get home to see his children. (ECF #102 at 265). There has been no evidence presented that would show that any of these requests were satisfied in exchange for his testimony. Mr.

_____

[19]

  Plaintiffs submitted a Declaration from Thomas Adgate, Esq, who had been Mr. Caton's attorney before and after he provided testimony at Plaintiff's trial. Mr. Adgate admits that he does not have any personal knowledge of any undisclosed agreements between the Defendants and Mr. Caton. The Declaration is nothing more a statement of opinion and speculation relating to Mr. Caton's motives in testifying. Mr. Adgate bases his conclusions, in part, on his judgment of Mr. Caton's character. As such, the Declaration is inadmissible under the Federal Rules of Evidence as he is not competent to testify on matters not within his personal knowledge, his testimony is based on impermissible character evidence, and his testimony is not probative. For these reasons, Defendants Motion to Strike his Declaration is GRANTED.

[20]

  Mr. Caton died in a police shoot out several years after Plaintiff's trial and before discovery could be taken in this case.

Caton testified that he hoped that by cooperating in Plaintiff's case, the prosecution would help him at his sentencing.  (ECF #102 at 264-67).

All of this information was disclosed to the jury at Plaintiff's trial.  There is absolutely no evidence that would show that the prosecutor or the Detectives made any promises to provide Mr. Caton a future benefit in exchange for his testimony.  The fact that Mr. Caton's testimony may have been influenced by a desire to obtain assistance is not evidence of a promise by the authorities to offer any such assistance.  Further, any favorable input that Detective McFarland may have provided in Mr. Caton's future criminal sentencings is not evidence of any prior promise made in exchange for testimony in Plaintiff's case.  *See Bell v. Bell*, 512 F.3d 223, 234 (6th Cir. 2008).[21]   Finally, as he testified in his deposition, Detective McFarland may have offered truthful information when requested at Mr. Caton's future sentencings and parole hearings, but he did not request leniency on his behalf and had never promised to do so in exchange for testimony at Plaintiff's trial.   (ECF #100 at 65-71).

### 3. Photo Arrays/February 15, 1993 Photograph

The original photo array shown to witnesses on February 14, 1993 by Detective Lacy and Sergeant Arnette is missing and has been missing since before the suppression hearing held on October 21, 1994.  In so far as this array appears to have been lost or destroyed rather than

---

[21]
There is evidence to suggest that Mr. Caton worked with police on matters other than the Neal Rankin murder, therefore, any benefit in he received in future cases could not necessarily be attributed to his assistance in the Rankin case.  (ECF #100 at 69).  Further, at the time of Mr. Caton's testimony, Detective McFarland could not have known that Mr. Caton would involve himself in future criminal activities, what those activities would be, or what sentencing decisions he would face.

simply withheld and Plaintiff has withdrawn his claim for destruction of evidence, he may not

have a remaining claim related to the failure to produce the array to the Plaintiff.[22]  Even if he

had not abandoned this claim, however, there is no evidence to suggest that array itself had any

exculpatory value or that the images and information contained therein was not otherwise

available to the Plaintiff.

Detective McFarland's testimony from the suppression hearing indicates that this array

did not include a photograph of the Plaintiff.  (ECF #104 at 60).   According to the Reports of

Investigation, Mr. Hughey also indicated that Plaintiff's picture was not included in this original

array.  (ECF#92-2 at 58).   There is no contradictory evidence to suggest that Plaintiff's picture

was part of this array.  Plaintiff knew the names of those identified in the first array prior to trial,

and, in fact, prior to his indictment on the murder, theft, and kidnaping charges.  Further,

Plaintiff and his defense had access to other photographs depicting the individuals identified, or

identified as look alikes to the suspect(s) seen by witnesses.  Because Plaintiff had sufficient

knowledge to take advantage of the information contained in the photo array, and because

obtaining these photographs would not be sufficient to 'undermine confidence' in the verdict, the

alleged withholding or destruction of this evidence does not rise to the level of a *Brady* violation

cognizable under the Due Process Clause.  *Wearry*, 136 S.Ct. at 1006; *Carter*, 218 F.3d at 601.

---

[22]

  There is no standalone due process claim under *Brady* for the destruction of evidence.
*See, Stillwagon v. Delaware*, 175 F.Supp.3d 874, 900 (S.D. Ohio 2016).  Destruction of
evidence claims must meet the standard set forth under *U.S. v. Jobson*, 102 F.3d 214, 219
(6th Cir. 1996).  This requires a showing the evidence destroyed possessed exculpatory
value that was apparent to the possessor prior to its destruction, and that the defendant
would be unable to obtain comparable evidence by other reasonably available means."
*U.S. v. Wright*, 260 F.3d 568, 570-71 (6th Cir. 2001).  Finally, there can be no recovery for
destruction of evidence unless the Plaintiff can show that the evidence was destroyed in
bad faith.  *Id.*

Plaintiff also references the thirty picture array in his connection with his suppression claim. The entire collection of thirty photographs shown to Mr. Strittmater and Mr. Hughey in December of 1993 was introduced as Exhibit 3 at the October 21, 1994 suppression hearing. (ECF # 104 at 57, 63-64). The suppression hearing took place prior to Plaintiff's trial, and, in fact, prior to his indictment for Aggravated Murder, Aggravated Robbery and Kidnaping. This evidence was both disclosed and available to Plaintiff prior to his trial, and, therefore, no *Brady* violation occurred with respect to the thirty picture array.

Within Exhibit 3 was a photograph of Plaintiff that Detective McFarland testified was taken by the police on February 15, 1993. That picture was introduced as Exhibit 3a at the suppression hearing. (ECF #140 at 57-58, 63-64; ECF #93-1 at 8-9). Plaintiff testified in his deposition that this picture was not taken on February 15th, but later in April of that same year. (ECF #117 at 140). Plaintiff testified in his deposition that the photo admitted as Exhibit 3a at the suppression hearing was not representative of the way he looked at the time of the murder because at that time he had a bushy beard and the photo depicts him as clean shaven. (ECF #117 at 140-141). Mr. Strittmater testified at the suppression hearing that the suspect seen in the breezeway was clean shaven, without a beard or mustache. (ECF #104 at 20). Plaintiff, therefore, claims that the February 15th photograph was exculpatory[23] and was withheld by the police.

Although Plaintiff argues that the photograph at issue showed him as clean shaven, the

---

[23]

According to the Reports of Investigation, Mr. Strittmater originally stated that the suspect in the breezeway was clean shaven. Mr. Hughey testified that the person he saw at the car had a mustache and was scruffy with facial hair consistent with a couple of days growth.

picture did show him with a full mustache. Therefore, the defense still had the opportunity to argue that the man in the photograph could not have been the person Mr. Strittmater saw in the breezeway if that photo was taken the day after the murder. In addition, if this photo was not an accurate depiction, Plaintiff knew this prior to trial, and he testified in his deposition for this case that he shared that information with his attorney. (ECF #117 at 143). At no time during his trial did Plaintiff's counsel reference or introduce evidence that would suggest that Exhibit 3a was not a true and accurate depiction of the Plaintiff at the time of the murder. Even if the police had taken a photograph of Plaintiff the day after the murder depicting him with a full bushy beard, and had failed to turn it over to the Plaintiff, there would be no constitutional violation because the information depicted in the photograph was known to Plaintiff and his defense counsel prior to his indictment and trial.[24]

        4. <u>Audio Recordings</u>

Plaintiff claims that the officers investigating this case destroyed audio recordings made during some of the witness interviews. He does not specify which tapes are missing or what information he thinks they contain that would have been exculpatory in his case. There is no

---

[24]

  Plaintiff argues that there is a "huge difference" between being able to tell one's attorney about their appearance and having contemporaneous evidence collected by the police that proves it." This may be true, however, *Brady* does not create a due process violation for withholding the best evidence of a fact. It does protect against withholding information that would provide the defense knowledge of an exculpatory fact. Plaintiff knew what he looked like on the date of the murder. He could have chosen to testify to this fact. His wife or other friends and acquaintances could have testified to this fact. He could have questioned Detective McFarland or other officers about his appearance and cross examined them on the claim that Exhibit 3a was a photo taken on February 15, 1993. He could have requested discovery of both photos taken by the police so that he could compare them. There are many ways he and his counsel could have addressed this issue. In the end, the alleged discrepancy was never addressed at the suppression hearing or at trial. This was not due to a lack of knowledge of the allegedly exculpatory information.

dispute that there are audio tapes of some interviews that cannot be currently located, however, Plaintiff does not contest the Defendants' assertion that they were all available to Plaintiff's defense counsel prior to and throughout Plaintiff's criminal trial. The record from the trial and the suppression hearing show that not only were some of these recordings available (Mr. Higgins and Mr. Caton), but that the information from those recorded interviews had been reviewed and used by defense counsel in cross-examination. (ECF #105 at 250-252; ECF #104 at 86-88).

Plaintiff does not identify any specific recording that he claims was unavailable prior to his trial, or that contained any exculpatory information that was required to disclosed under *Brady*. He does not point to any recording that may have contained information not available through the Reports of Investigation, and does not have any evidence that they have been destroyed by a Defendant in this action. Further, any claim for destruction of evidence has been surrendered by the Plaintiff and any loss of the recordings subsequent to his trial could not have affected the constitutionality of his conviction. Plaintiff, therefore, cannot prove any cause of action related to the suppression of audio recordings, and he has failed to address this issue in his Opposition to Summary Judgment.

5. Murder Weapon

Plaintiff alleged that the police withheld information about who possessed the murder weapon at the time of the murder. However, at the time of Plaintiff's trial, the police did not know that the gun they had found was, in fact, the murder weapon. Plaintiff had access to the known information about the weapon found in Bill Simpson's trunk, including the name of the person he got it from. (ECF #117 at 72-73). Further, Plaintiff testified in his deposition that Bill Simpson told him that he had the murder weapon in his trunk, and Plaintiff says that he

repeatedly related this information to his attorney, Vincent Alfera, and to Detective McFarland beginning when he was charged with tampering and obstruction of justice. (ECF #117 at 71-75, 134). The transcript of the suppression hearing also makes obvious that Plaintiff was aware of the existence of the gun and was given an opportunity to delay his trial in order to have the gun tested. Plaintiff, therefore, had access to information about the murder weapon prior to trial and could have used this information in his defense if it had been useful to his case. There is no evidence that any information related to the gun was withheld from Plaintiff prior to his trial, and he does not address the alleged withholding of information related to the gun in his Opposition to Summary Judgment. Plaintiff has not satisfied his burden to refute Defendants' request for summary judgment on this issue.

B. Suggestive Identification

A criminal defendant has a constitutional right "to be free from identification procedures 'so unnecessarily suggestive and conducive to irreparable mistaken identification' that the identification's use violates due process of law." *Gregory v. Louisville*, 444 F.3d 725, 745-46 (6th Cir. 2006). In order to recover under 42 U.S.C. §1983, based on a suggestive identification procedure, a Plaintiff must prove not only that the procedures leading to his alleged misidentification were suggestive, but that they were so unduly suggestive that he was denied a fair trial. *See, e.g., Hutsell v. Sayre*, 5 F.3d 996, 1005 (6th Cir. 1993); *Sutton v. Metropolitan Government of Nashville and Davidson Cty.*, 2011 WL 13186528, *5 (M.D. Tenn. 2011). If the procedures are found to be unduly suggestive, the court must then consider whether the identification was nevertheless reliable. *Haliym v. Mitchell*, 492 F.3d 680, 704 (6th Cir. 2007); *see also Perry v. New Hampshire*, 565 U.S. 228, 248 (2012).

In this case, the identifications introduced as evidence at Plaintiff's trial were challenged at a suppression hearing that took place in connection with Plaintiff's indictment on obstruction of justice and tampering with evidence charges before he was re-indicted for Aggravated Murder and other charges. The judge held a full suppression hearing with multiple witnesses testifying, and was fully aware of the number of times these witnesses were asked to view photographs. The testimony also described the conditions surrounding those viewings. Although at that hearing there was testimony suggesting that Mr. Strittmater had identified Plaintiff prior to seeing the single Christmas photo showing him wearing glasses, Plaintiff and his counsel had full access to the Reports of Investigation that would have contradicted that information, and had the opportunity for cross-examination of the witnesses who testified in this manner. The judge ruled the process was not "unduly suggestive in any way" and that the witnesses "had sufficient opportunity to observe the individual the day in question," She was not "convinced that the out-of-court identification in this case was in any way suggested by or unduly influenced by the photo array process that was conducted in this case," of that "that procedure in any way contributed to the identification by Mr. Strittmater or Mr. Hughey." (ECF #104 at 97-98). There is no evidence that Plaintiff asked for another suppression hearing or sought reconsideration of this ruling when he was re-indicted on the more serious charges.

At Plaintiff's trial, the judge and the jury heard evidence about the number of arrays and photographs shown to the witnesses, were able to view the photo arrays challenged in this case, heard evidence that each witness had at some point identified other suspects as being or looking like the suspect they saw, and would have seen that the Christmas photo was the only picture shown with a subject that was wearing glasses. They were able to take this information into

account when determining the reliability and credibility to be afforded to those identifications. Although there is no way of knowing whether the jury found Mr. Strittmater's identification to be credible, it did find the evidence overall to be sufficient to convict Plaintiff. The question of the suggestiveness and/or reliability of the identifications was never raised after the initial ruling on Plaintiff's motion to suppress. The decision was not appealed and was not mentioned in the petition for *habeas* relief. Any challenge to the admissibility of the identifications was waived when Plaintiff failed to appeal that issue.[25] He cannot seek to have that decision overturned through a civil action more than twenty years later.

Collateral estoppel or issue preclusion prevents re-litigation of an issue of fact or law that has previously been decided by a court, in a later suit on a different cause of action involving a party to the first. Collateral estoppel applies as long as the party against whom the ruling was made had a full and fair opportunity to litigate the issue in the earlier case. *Allen v. McCurry*, 449 U.S. 90, 94 (1980). Federal courts consistently accord preclusive effect to issues decided by state courts, and the principles of collateral estoppel are applicable in §1983 actions. *Id.* at 95. In this case, the question of whether the identifications by Mr. Strittmater and Mr. Hughey were unduly suggestive and/or sufficiently reliable to be admissible in Plaintiff's trial were decided by the state court at the suppression hearing and, implicitly, at his trial. Plaintiff had a full and fair opportunity to litigate the issue and had all of the information necessary to present his case on the matter at that time. He also had every opportunity to appeal the decision in his direct

---

[25]

After Plaintiff's conviction was overturned, Plaintiff filed a Motion to Suppress in anticipation of his retrial. That motion was denied. *Ohio v. Jones*, December 12, 2013 Journal Entry, Summit Cty. Ct. Common Pleas Case No. CR 1994-06-1409(C), ECF #92-1 Ex. O).

appeals, and/or to raise the issue in his *habeas* proceedings but he failed to do so. He may not re-litigate this issue now, more than twenty years after the first ruling, when he had every opportunity to fairly address the issue at that time.[26]

C. Fabricated Evidence

The Complaint generally alleges that Defendants in this case fabricated evidence against Plaintiff by encouraging witnesses to misidentify Plaintiff or by asking or encouraging jailhouse informants to lie about Plaintiff's connection to the murder. "It is well established that a person's constitutional rights are violated when evidence is knowingly fabricated and a reasonable likelihood exists that the false evidence would have affected the decision of the jury." *Gregory v. Louisville*, 444 F.3d 725, 737 (6th Cir. 2006). A claim of fabrication of evidence does not require a showing that, absent the fabrication, the state would not have had probable cause to prosecute the claimant. *Stemler v. City of Florence*, 126 F.3d 856, 872 (6th Cir. 1997). There is no evidence to support a claim that Defendants in this case asked or encouraged witnesses to misidentify the Plaintiff or to fabricate evidence.

1. Informant Testimony

---

[26]
The reasoning underlying the *Allen* decision allowing the application collateral estoppel in §1983 cases, is reiterated in several other long established, strongly held principles of judicial review, including the *Heck* doctrine, waiver, law of the case, the mandate rule, and res judicata or claim preclusion. All of these doctrines are aimed at avoiding the potential for conflicting judgments arising out of the same or identical transactions, prohibiting collateral attacks on a criminal conviction through the use of civil suits, and promoting finality and consistency. *Heck v. Humphrey*, 512 U.S. 477 (1994); *Parke v. Raley*, 506 U.S. 20, 29-30 (1992); *Teague v. Lane*, 489 U.S. 288, 308 (1989); 8 S. Speiser, C. Krause, & A. Gans, American Law of Torts §28:5, p. 24 (1991). This reasoning behind all of these longstanding doctrines dictates that this Court should not overturn or second guess the decisions of a state court judge when the Plaintiff had a full and fair opportunity to present evidence, challenge the ruling, and appeal the state court decision, but failed to do so.

Plaintiffs claim that Detective McFarland asked or encouraged Michael Higgins and Bill Caton, to fabricate evidence against him. Mr. Higgins never testified at Plaintiff's trial. Therefore, even if he did fabricate evidence it would not have impacted Plaintiff's right to a fair trial. Further, Plaintiff and his attorney were aware, prior to trial that there were witnesses at the jail who claimed that Michael Higgins made up the information about Plaintiff that he provided to the police about Plaintiff. (ECF #117 at 135). This information was also contained in a Report of Investigation filed by Detective Parke on October 23, 1994. (ECF #101 at 329-332). Plaintiff had the information necessary to impeach Mr. Higgins if he were to have testified at trial. Further, even if Mr. Higgins had fabricated evidence against Plaintiff, Plaintiff has pointed to no evidence that would show that Detective McFarland or Detective Parke ever asked, ordered, or encouraged Mr. Higgins to do so.

Mr. Caton did testify against Plaintiff at his criminal trial. However, there is no evidence to support a finding that the Defendants in this case offered any incentive or encouragement to Mr. Caton to fabricate evidence. The evidence shows that Mr. Caton first contacted Detective Parke, and later the prosecutor to offer information about the Plaintiff's connection to the murder. Plaintiff, in his deposition testimony, states that Mr. Caton's testimony was false and that he never discussed anything related to Mr. Rankin's murder with Mr. Caton. (ECF #117 at 133). He does not provide any evidence to suggest that Detectives McFarland and Parke had a reason to know that Mr. Caton's testimony may have been false, or that they encouraged or asked him to lie about having a conversation with the Plaintiff.[27] Even if the information about

---

[27] In his Brief in Opposition to Summary Judgment Plaintiff argues that Detective McFarland "did not care to investigate" whether the gun found in Billy Simpson's car was the murder weapon. This does not bear on whether Mr. Caton's testimony was fabricated.

Plaintiff allegedly disposing of the murder weapon turned out to be false, the police did not know that the weapon they had retrieved was the murder weapon until well after Plaintiff's trial, nor could they know if Plaintiff might have provided Mr. Caton false information in an attempt to throw off the investigation. There is simply no evidence that the Detectives in this case participated in any way in the alleged fabricated of Mr. Caton's identification evidence, or that they believed or had reason to believe that his testimony was false at the time of the trial.

### 2. Identification Witnesses

Plaintiff also claims that Detective McFarland fabricated evidence by manipulating Mr. Strittmater and Mr. Hughey's identification of the Plaintiff. Mr. Strittmater and Mr. Hughey testified, under oath, of their own free will. There is no evidence that Detective McFarland colluded with the witnesses on their testimony, thus, their testimony whether accurate or false is not evidence of a fabrication by Detective McFarland. If they were mistaken in their testimony, or their identifications were unreliable, Plaintiff had the information to challenge both of those aspects at the time of the suppression hearing and again at trial.

Further, there is no evidence to contradict Detective McFarland's statement attesting that he did not believe that Mr. Strittmater's identification of Plaintiff would be used as evidence. He testified that he did not show the Christmas photo to Mr. Strittmater to get an identification of the person in the breezeway, and he did not follow up on Mr. Strittmater's comment that the photo looked like the man in the breezeway because he did not view this comment as evidence.

Even if this were true, it would have no impact on Plaintiff's claims. A detective's decision on which leads to investigate would generally be subject to absolute immunity. Further, Plaintiff and his counsel were given the chance to have the weapon tested between the time of Plaintiff's suppression hearing and his trial to determine whether it was the murder weapon. It appears that the gun was tested but due to limitations in testing methods at that time no match could be determined. (ECF #98 at 329-31).

(ECF #100 at 209, 213-214). He stated that he did not believe that it would be considered evidence of an identification because it is was a single photo array, the photo was not tagged, the background and other people were not cropped out, it did not match any other filler photos with regard to background or cropping, and he knew at that time that the showing of that single photograph was suggestive. (ECF #100 at 211-213). [28] Although he believed that it was nothing that could be used as evidence, Detective McFarland testified during deposition that he showed the picture to see if Mr. Strittmater might look at it and decide that his earlier identification of Billy Wilson was wrong. (ECF #100 at 211). Detective McFarland also disagreed that this identification and other evidence was a sufficient basis upon which to seek an indictment against Plaintiff for the murder, robbery, and kidnaping. Therefore, there is no reason to believe that any of his communications with Mr. Strittmater were intended to get him to provide false evidence against Plaintiff.

### 3. Detective McFarland's Testimony

Plaintiff has further alleged that Detective McFarland's testimony at the suppression hearing was not truthful and that he misrepresented information about the identification procedures. There were contradictions between his testimony at the suppression hearing and his Reports of Investigation, notes, and trial testimony, relating to the timing of Mr. Strittmater's identification of Plaintiff. At the suppression hearing, the Detective testified that Mr. Strittmater identified Plaintiff from the thirty photographs presented on December 23, 1993, and from an array provided to him on May 3, 1994 before he was shown the Christmas photograph showing

---

[28]

Detective McFarland was trained in, and actually taught classes on how to utilized photo arrays for identification. (ECF #100 at 25-30).

-42-

Plaintiff in glasses. (ECF #104 at 63-68 75-76). The Reports of Investigation, and Detective McFarland's notes and deposition testimony all state that Mr. Strittmater identified Billy Wilson from the thirty photograph spread, and that he did not identify Plaintiff until after he was shown the Christmas photograph. (ECF #92-2 at 60-66; ECF #100 at 199-209, 213-214; ECF #101 at 145).

Nonetheless, Detective McFarland is entitled to absolute immunity from liability for any alleged misstatements or falsehoods in his testimony at the hearing. Absolute immunity applies to testimony given at adversarial judicial proceedings, even if the testimony knowingly is knowingly false. *Briscoe v. LaHue*, 460 U.S. 325, 345 (1983); *Gregory v. City of Louisville*, 444 F.3d 725, 738 (6th Cir. 2006). The suppression hearing was an adversarial judicial proceeding, wherein Plaintiff was represented by counsel and had access to all information necessary to impeach Detective McFarland on any alleged false testimony.

Even if immunity did not protect Detective McFarland in this instance, the suppression hearing took place in connection with Plaintiff's indictment for obstruction of justice, prior to Plaintiff's indictment on Aggravated Murder, Aggravated Robbery, and Kidnaping, the underlying charges in this case. There is no indication that Plaintiff requested a rehearing on the motion to suppress when his charges were increased, nor did he ever challenge the ruling from the suppression hearing at trial, on appeal, or in his *habeas* proceedings. A suggestive pre-indictment identification procedure does not necessarily violate a constitutionally protected interest. *Manson v. Braithewaite*, 432 U.S. 98, 113, n. 3 (1977). The judicially created rules relating to identification procedures establish prophylactic evidentiary rules designed to protect the right to a fair trial, but the violation of these rules does not *ipso facto* render the trial unfair.

*Hutsell v. Sayre*, 5 F.3d 996, 1005 (6th Cir. 1993); 42 U.S.C. § 1983.

In this case, if Detective McFarland gave mistaken or even false testimony at the suppression hearing, it did not affect the overall fairness of Plaintiff's trial. Plaintiff may argue that the court's decision at the suppression hearing, which allowed Mr. Strittmater's testimony identifying Plaintiff as the man in the breezeway, may have been influenced by Detective McFarland's mistaken and/or false testimony about the identification process and thereby affected the fairness of his trial. However, even if Detective McFarland had not testified that Mr. Strittmater identified Plaintiff prior to seeing the Christmas photo with him in glasses, Mr. Strittmater himself testified that he picked Plaintiff's picture from the photographs presented to him in December of 1993 and May of 1994 prior to seeing the Christmas photo. He said that he was not positive during the December identification, but he positively identified Plaintiff in May and in person, in the courtroom.[29]  Therefore, the court would have heard from Mr. Strittmater that Plaintiff was identified prior to the showing of the Christmas picture, and would have factored this information into its decision whether or not Detective McFarland had testified the same way.

In addition, Plaintiff and his counsel had access to the Reports of Investigation that contradicted Detective McFarland's and Mr. Strittmater's testimony about Plaintiff's identification during the December and May identification processes. The due process clause does not and cannot protect defendants from misstatements or false statements during pre-trial

---

[29] On cross-examination he also testified that he said during the December array that Bill Wilson's photo "probably look[ed] pretty close to" the person in the breezeway. (ECF #104 at 22).

proceedings or even at trial. It only guarantees that the defense has access to any exculpatory or impeachment evidence that can be used to test the truth and accuracy of the evidence presented against him. In this case, it is undisputed that the defense had access to the Reports of Investigation, and those reports had all of the information needed to challenge the credibility of these witness' identification testimony. It may well be that this information was not used to its highest potential during the suppression hearing or at trial, but it is also clearly evident from the questions posited on cross-examination that the defense was aware of information that contradicted the allegedly false testimony.

Most importantly, there is no allegation that Detective McFarland misrepresented or fabricated information in his own testimony at Plaintiff's actual trial. He testified at trial that Mr. Strittmater identified Bill Wilson from the thirty photograph spread as the looking like the person leaving the breezeway if he was cleaned up and in different clothing. (ECF #105 at 437, 439). He was not allowed to testify about Mr. Hughey's identification of Larry Hayes because he was not present for that identification, but he did not dispute it. (ECF #105 at 422). He did not testify to any identification of Plaintiff by Mr. Strittmater prior to his viewing of the Christmas photograph showing Plaintiff wearing glasses. (ECF #105 at 445). He correctly testified that Mr. Hughey absolutely identified Plaintiff as the person at Mr. Rankin's car, and that both witnesses identified Plaintiff when they saw him for the first time in person at the suppression hearing. (ECF #105 at 445, 447). This testimony is supported by the Reports of Investigation and by Detective McFarland's notes. (ECF #102 at 305-06; ECF #101 at 145). Plaintiff does not dispute any of these facts, and has, himself, asserted several of them to be true. There is nothing in Detective McFarland's trial testimony that Plaintiff has identified as

-45-

fabricated evidence, or that otherwise impacted his right to a fair trial.

    D. <u>Malicious Prosecution</u>

A Section 1983 claim for malicious prosecution requires proof of the following elements: (1) a criminal prosecution was initiated against the plaintiff, and the defendant made, influenced, or participated in the decision to prosecute; (2) there was a lack of probable cause for the criminal prosecution; (3) the plaintiff suffered a deprivation of liberty, as understood under the Fourth Amendment jurisprudence, apart from the initial seizure; and (4) the criminal proceeding was resolved in plaintiff's favor." *King v. Harwood*, 852 F.3d 568, 580 (6th Cir. 2017). The parties in this case agree only that element three is satisfied, as Plaintiff has been incarcerated for just under twenty years. This Court finds no need to discuss elements one and four, because Plaintiff cannot satisfy the second element as there was clearly probable cause for his prosecution.

As a general rule, "the finding of an indictment, fair upon its face, by a properly constituted grand jury, conclusively determines the existence of probable cause." *Barnes v. Wright*, 449 F.3d 709, 716 (6th Cir. 2006). The presumption of probable cause is rebuttable "where (1) a law-enforcement officer, in the course of setting a prosecution in motion, either knowingly or recklessly makes false statements (such as in affidavits or investigative reports) or falsifies or fabricates evidence; (2) the false statements and evidence, together with any concomitant misleading omissions, are material to the ultimate prosecution of the plaintiff; and (3) the false statements, evidence, and omissions do not consist solely of grand-jury testimony or preparation for that testimony (where preparation has a meaning broad enough to encompass conspiring to commit perjury before the grand jury." *King v. Harwood*, 852 F.3d 568, 587-88

(6th Cir. 2017), *cert. denied*, 2018 WL 311323 (U.S. Jan. 8, 2018).

Plaintiff alleges, and submits some evidence to support his contention, that Detective McFarland made knowing or reckless false statements at the suppression hearing relating to the identification made by Mr. Strittmater. Both parties agree that the prosecutor relied on the information provided at the suppression hearing when he decided to seek indictment against the Plaintiff for Aggravated Murder, Aggravated Robbery, and Kidnaping. There is insufficient evidence, however, to show that any alleged misrepresentations by Detective McFarland were material to his prosecution on these charges.

First and foremost, it is important to note that not only did the Grand Jury determine that there was probable cause to prosecute, but the Judge in Plaintiff's criminal judge, after hearing the available evidence, overruled Plaintiff's motion for acquittal under Ohio's Rule of Criminal Procedure 29, finding sufficient evidence not only for probable cause, but to sustain a conviction. This allowed the case to go to the jury who determined that the evidence went far beyond a standard of probable cause and satisfied the standard for conviction, beyond a reasonable doubt. There is no evidence that has been presented to show that Plaintiff ever challenged the sufficiency of the indictment either prior to or after trial. The Court of Appeals found sufficient evidence to support his conviction beyond a reasonable doubt on the charges of Aggravated Murder and Aggravated Robbery.[30] The original trial court found that the identifications of Plaintiff were admissible. Even after the DNA evidence was returned and Plaintiff was granted a new trial, no court ever suggested that there had not been sufficient

---

[30] The Court of Appeals did dismiss the Kidnaping charge for insufficient evidence, but there was no finding that the prosecution lacked probable cause to pursue even this charge.

evidence to prosecute Plaintiff for these charges, or that there had been any constitutional infirmities in his original trial.

Even if a jury could believe that Detective McFarland misrepresented information pertaining to the identification of Plaintiff by the witnesses at the suppression hearing, this would not have been material to the establishment of probable cause to prosecute Plaintiff on the charges of which he was convicted. The prosecution had testimony from two witnesses who both, under oath at the suppression hearing and at his original trial , testified that they had seen Plaintiff in connection with the murder. Mr. Strittmater testified that he saw Plaintiff in the breezeway on the night of the murder, and Mr. Hughey testified that he saw Plaintiff with the victim's car on the following day. Mr. Strittmater's testimony differed from information in the Reports of Investigation, but on stand and under oath he never wavered from his testimony identifying Plaintiff. Plaintiff and his counsel had access to all of the Reports of Investigation that could have been used to question the credibility of Mr. Strittmater's identification, but his testimony at the hearing and at trial was clear and provided the same information as did Detective McFarland. Therefore, even if Detective McFarland had never testified at the suppression hearing, the identification of Plaintiff by both witnesses would have been heard and would have supported his indictment on the higher charges of Aggravated Murder and Aggravated Robbery.

Further, the prosecution, at least by the time of trial, had testimony from the jailhouse informant, Mr. Caton. Mr. Caton testified that Plaintiff confessed to having murdered Mr. Rankin. This, even standing alone, would have been enough to establish probable cause for prosecution. As there was probable cause to prosecute Plaintiff, notwithstanding any

information allegedly misreported by Detective McFarland, there can be no recovery under Section 1983 for a claim of malicious prosecution.

### E. Conspiracy

Plaintiff alleges that Detectives McFarland and Parke were engaged in a conspiracy to wrongfully secure his conviction. "A civil conspiracy is an agreement between two or more persons to injure another by unlawful action." *Heyne v. Metro Nashville Pub. Schs.*, 655 F.3d 556, 563 (6th Cir. 2011). No conspiracy can be found absent the undertaking of an overt act in furtherance of the conspiracy. *Id.* As set forth above there is no evidence to support a claim that either Detective McFarland or Detective Parke, separately or in combination, engaged in any unlawful action in connection with Plaintiff's investigation and prosecution.

### F. Monell

The City cannot be held liable under Monell because there has been no showing of a constitutional violation. Further, even if the Detective or other officers had committed a violation of Plaintiff's constitutional rights, Plaintiffs have made absolutely no showing whatsoever that such violations were the result of the City's policies, practices, or customs, as required under *Monell*. *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986).

## II. State Law Claims

### A. Immunity

The Defendants argue that they are entitled to statutory immunity with regard to the Plaintiff's state claims. The City of Akron is a political subdivision of the state of Ohio. It is, thereby, immune to suit under O.R.C. §2744.02(A)(1), and none of the exceptions to immunity under O.R.C. §2744.02(B) apply in this case. Plaintiff does not contest that the City is entitled to

immunity, and voluntarily and explicitly abandoned this claim in his Opposition to Defendants'
Motion for Summary Judgment. (ECF #128 at 24, fn. 10).

Ohio Revised Code Chapter 2744 also grants immunity to employees of political
subdivisions for actions arising out of the course and scope of their employment with the
political subdivision. *Fabrey v. McDonald Village Police Dept.* , 70 Ohio St.3d 351, 357 (1994).
Specifically, the statute provides immunity unless one of the following exceptions apply:

（1）the employee's acts or omissions were manifestly outside the scope of their
employment;

（2）the employee's acts or omissions were with malicious purpose, in bad faith, or
in a wanton or reckless manner; or,

（3）civil liability is expressly imposed by a section of the Revised Code.

Ohio Rev. Code § 2744.03(A)(6)(a)-(c).

There is no evidence that Detectives McFarland or Parke were ever acting manifestly
outside the scope of their employment, or acting maliciously, in bad faith, or in a wanton or
reckless manner.[31] There are also no allegations that they are subject to civil liability expressly
imposed by a section of the Revised Code. None of the exceptions to immunity exist under the
facts of this case. Therefore, the Detectives are entitled to statutory immunity on Plaintiff's state
law claims. Even if they were not entitled to immunity, however, the Plaintiff's state law claims

---

[31]

    The only allegation supported by any evidence that could support a finding of bad faith,
wanton, or reckless behavior is the allegation that Detective McFarland gave false
testimony at the suppression hearing. As set forth above, however, he is entitled to
absolute immunity for testimony given at an adversarial judicial proceeding. Further,
Plaintiff had all of the information needed to cross-examine him on the allegedly false
statements at the time of the hearing. In addition there are no allegations that his
testimony at trial was false in any respect.

would fail on the merits.

B. <u>Malicious Prosecution</u>

Malicious Prosecution under Ohio law requires proof of (1) the malicious institution or continuance of an earlier proceeding; (2) lack of probable cause for the earlier proceeding; and (3) termination of the prior lawsuit in favor of the claimant. For the reasons set forth above in the discussion of malicious prosecution under 42 U.S.C. §1983, the Court finds that probable cause existed for the Plaintiff's prosecution. Therefore, Plaintiff has no valid claim for malicious prosecution under Ohio law.

C. <u>Infliction of Emotional Distress</u>

Neither party has briefed the claim of Intentional Infliction of Emotional Distress, other than Defendants generalized argument that the Defendants are all immune from the state law claims. However, because there is no evidence that would support Plaintiff's claims that his conviction was unlawfully obtained, he cannot recover from the Defendants for any distress caused by his conviction and subsequent incarceration.

D. <u>Indemnification</u>

Plaintiff has presented no evidence that would support a claim for indemnification.

E. <u>Spoilation of Evidence</u>

Plaintiff voluntarily abandoned this claim in his Opposition to Defendants' Motion for Summary Judgment. (ECF #128 at 24, fn. 10).

<br>

**<u>Conclusion</u>**

There is absolutely no evidence that has been presented in this case that would even

suggest that Detective Parke did anything that would have violated Plaintiff's constitutional right to a fair trial. The evidence also fails to establish that any information in Detective McFarland's undisclosed file that was otherwise unavailable to the Plaintiff, was exculpatory or would have been useable as impeachment of the trial witnesses. Further, even there had been such information in the Detective's notes, he is entitled to qualified immunity as there no clearly established law at the time requiring officers to produce their personal field notes in discovery. The officers are also entitled to qualified immunity on the other allegations of suppression of evidence because there was no apparent exculpatory value to the other information allegedly withheld. Detective McFarland is also entitled to absolute immunity for any misstatements he may have made during his testimony at the suppression hearing. The missing photographs were also either not exculpatory or contained images otherwise available or known to the Plaintiff.

There is also absolutely no evidence that Mr. Caton was offered undisclosed benefits in exchange for his testimony, or that the Detectives fabricated any evidence used against the Plaintiff at his trial. Further, the issue of the admissibility and reliability of Mr. Strittmater and Mr. Hughey's identifications was resolved by the state court after a full and fair opportunity for Plaintiff to make his case. He failed to appeal that ruling, or to ever raise the issue in any post-conviction filings. Collateral estoppel, therefore, bans his attempt to relitigate that issue now.

There was, without a doubt, probable cause for Plaintiff's prosecution even without the identifications questioned by the Plaintiff in this action, and there is no evidence that he was prevented, in any manner, from presenting a fully informed defense to the charges brought against him. Finally, pursuant to Ohio Rev. Code §§ 2744.02 and 2744.03, the Defendants are all immune from any liability on the state law claims

For the reasons set forth above, Defendants' Motion to Strike Declaration of Thomas Adgate, Esq. (ECF #135) and Defendants' Motion for Summary Judgment (ECF# 92) are both GRANTED. Pursuant to Fed. R. Civ. Pro. 56, Judgment is entered in favor of the Defendants on all claims. IT IS SO ORDERED.


      /s Donald C. Nugent
DONALD C. NUGENT
United States District Judge

DATED:  April 23, 2018